[No. 63744-0.   En Banc.]

Argued October 22, 1997.      Decided April 30, 1998.

THE STATE OF WASHINGTON, *Respondent*, v. JEREMY VARGAS SAGASTEGUI, *Appellant*.

*Jeremy V. Sagastegui*, pro se.

*Sonderman & Swanberg*, by *Carl G. Sonderman*, for appellant.

*Andrew K. Miller, Prosecuting Attorney*, for respondent.

*Michael P. Iaria, Roger A. Hunko*, and *Jeffrey E. Ellis* on

behalf of Washington Association of Criminal Defense Lawyers, amicus curiae.

ALEXANDER, J. — Jeremy Sagastegui pleaded guilty in Benton County Superior Court to three counts of aggravated first degree murder. Following a special sentencing hearing, a jury returned with the answer "yes" to the question, "[h]aving in mind the crime of which the defendant has been found guilty, are you convinced beyond a reasonable doubt that there are not sufficient mitigating circumstances to merit leniency?" Clerk's Papers (CP) at 144. Following receipt of the verdict, and imposition of a death sentence, the trial court approved Sagastegui's waiver of his right to appeal and to have assistance of counsel on review. Thereafter, Sagastegui has consistently refused to defend himself or to reconsider his decisions to not pursue an appeal or have the benefit of counsel, and he has not presented any brief to this court. The Death Penalty Committee of the Washington Association of Criminal Defense Lawyers did, however, petition to appear as amicus curiae on the issues this court is required to review pursuant to RCW 10.95.130, and we granted its petition.

## FACTS OF THE OFFENSES

Sometime between the evening hours of November 18 and the early morning hours of November 19, 1995, at a residence in Finley, Washington, Jeremy Sagastegui sexually abused, beat, stabbed and then drowned Kievan Sarbacher (Kievan), a three-year-old boy who was in his care. Sagastegui then waited for Kievan's mother, Melissa Sarbacher (Sarbacher), to return home. When she did so, he shot her and her friend, Lisa Vera-Acevado, who had accompanied Sarbacher home.

Later, on November 19, 1995, deputies of the Benton County Sheriff's Office were dispatched to Sarbacher's residence after receiving a call from a neighbor. There, they found the body of Vera-Acevado lying outside the home. The deputies then went inside the residence and discovered Sarbacher's body on the floor of the living room. In one bedroom, they found two-year-old Tiana Sarbacher standing in a crib. She was unharmed. In the master bedroom, they found the lifeless body of three-year-old Kievan lying on a bed. The child, who was wrapped in a green terry cloth towel, appeared slightly bluish in color and was cold to the touch.

The deputies observed a large bloody butcher knife next to Kievan's body. They also found a jar of petroleum jelly on the bed. A later examination of Kievan's corpse with a forensic light disclosed three small droplets on the inner thigh. An examination of the substance in the jar with the forensic light revealed that it luminesced in the same manner as did the droplets discovered on the child's body. Within a bathtub in a bathroom located near the master bedroom, the investigating deputies found water and toys. They also found bloodstains on the side of the tub.

Autopsies were performed on the bodies of all three victims by Dr. Terri Haddix, a forensic pathologist. Haddix found that Kievan had been stabbed in the right side of his abdomen. She also observed bruising about the child's head and three lacerations in Kievan's anus, all of which had produced bleeding. She opined that penetration of "something" into the anal canal would have produced these lacerations. Report of Proceedings (RP) at 1041. She believed that the wounds to Kievan's anus were of recent origin based on the fact that there was no evidence of healing or inflammation. Haddix concluded that Kievan's death was not caused by any of the aforementioned injuries but, rather, by drowning. This conclusion was based on her discovery of the presence of foam within Kievan's nose and upper airways and her finding that the child's lungs were expanded in appearance.

Haddix concluded that Vera-Acevado's death was caused by a single gunshot wound to the middle of her chest. Sarbacher, on the other hand, had been shot twice. One bullet penetrated her chest and the other entered through her neck and passed through her brain. Haddix could not determine which wound was suffered first, but she opined that either would have been fatal.

Detectives from the Benton County Sheriff's Office also conducted several interviews on November 19. One interview was with Sarbacher's friend, Korina Barnett, who told the detectives that she had seen Sarbacher and Vera-Acevado twice during the evening of November 18. Sarbacher told Barnett at one point during the evening that Sagastegui was baby-sitting Sarbacher's two children. Karen Southham, Vera-Acevado's cousin, informed the detectives that she knew they were looking for Sarbacher's black Ranger truck.

The following day, November 20, Southham observed the Ranger truck in the parking lot of the apartment building where Sagastegui was living. She immediately reported this observation to the Benton County Sheriff's Office. CP at 425. That same day, Scott Peterson, Sagastegui's roommate, told Sheriff's detectives that Sagastegui had called him on the afternoon of November 18 and asked if he "could bring Melissa's kids over." CP at 425. Peterson said that he declined Sagastegui's request. Peterson indicated that he let Sagastegui into their apartment early on the morning of November 19 and that Sagastegui could still be found at that location.

Benton County detectives immediately obtained a warrant authorizing a search of Sagastegui's apartment. Sagastegui was at his apartment when the detectives arrived to execute the warrant. Upon confronting Sagastegui, the detectives advised him of his *Miranda* rights.[1] Sagastegui indicated that he would waive his rights and would talk to the detectives. He proceeded to tell the detectives that there

---

[1] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694, 10 A.L.R.3D 974 (1966).

was a set of keys in his closet and "something under the couch . . . that [they] would be interested in." RP (2/6/96) at 1002.

In response to Sagastegui's remark, the detectives lifted the couch and found beneath it a ".30/.30" rifle with a brown leather strap. It was later identified as belonging to Wes Boulware, Sarbacher's friend, who indicated that he normally kept the rifle at the residence where Sarbacher was killed. The detectives also retrieved a set of keys from Sagastegui's closet and determined that they fit into the door lock and ignition of the black Ranger truck.

Bullets and bullet fragments recovered from Sarbacher's home were sent to the Washington Crime Laboratory along with the rifle found at Sagastegui's apartment. After conducting tests on these items, experts at the laboratory concluded that the bullets discovered at the scene had been fired from the rifle. Tests also revealed that Sagastegui's fingerprints were on the rifle. In addition, the crime laboratory concluded that Sagastegui's fingerprints matched fingerprints found on a lampshade and beer can which were found at Sarbacher's residence as well as those found on a bathroom wall within the residence.

Sagastegui was then taken to Benton County Sheriff's Office. After readvising him of his constitutional rights, Detectives Terry Carlson and Phil Carpenter asked Sagastegui if he had any information about the homicides in Finley. Sagastegui replied that he had killed all three persons whose bodies had been found. He then gave a detailed, tape-recorded statement recounting the events that had taken place on the night of November 18 and the morning of November 19.

Sagastegui told the detectives that he had agreed to baby-sit for Sarbacher on Saturday evening, November 18th at her home in Finley. He said, that before Sarbacher left her home that night, he helped her put her two children, Tiana and Kievan, to bed. According to Sagastegui, Kievan woke up later that evening, "screaming and yelling" for his mother. CP at 159. Sagastegui said that he told Kievan to

"shut up" and when he did not do so, he "grabbed him and shoved his head into a pillow." CP at 159.

Sagastegui was unclear about the sequence of events that occurred thereafter. Although he said that he stabbed Kievan and raped him anally, using a jar of Vaseline in the process, he did not recall which act he committed first. Sagastegui went on to say that after stabbing Kievan, he put the child into the bathtub to "make sure he was dead," and then wrapped Kievan in a towel "so his guts wouldn't spill out all over the place" and threw him onto the bed. CP at 163.

Sagastegui told the detectives that he then got a rifle from a bedroom and checked to see if it was loaded. While waiting for Sarbacher to come home, he became angry because she knew he was "nuts already and she asked [him] to babysit these kids." CP at 164. He admitted that his plan was to shoot Sarbacher when she walked through the door. CP at 164. Sagastegui said that when Sarbacher entered the residence he pointed the rifle at her. He described her reaction, saying, "she's asking me what I'm doing with that and walks by like she's . . ., you know, like nothing." CP at 166.

Sagastegui told Carlson and Carpenter that the rifle did not work the first time he tried to shoot Sarbacher with it. This caused him to be "more amazed now than mad" because she did not "like run or something." CP at 167, 166. He pulled the trigger again and this time it worked, causing Sarbacher to "fall[ ] back." CP at 167. When Vera-Acevado entered the doorway of Sarbacher's residence, he shot her too, causing her to fall backward, landing outside of the house. Sagastegui told the detectives that he wished Vera-Acevado had not shown up but that "she was there and she saw me so I shot her." CP at 167. Sagastegui said that he had to shoot "Melissa [Sarbacher] twice cause she was still alive." CP at 168. He noted that Sarbacher was screaming and "there was terror in that girl's eyes," but he thought the terror was more from her fear of "what happened to her kids" and that "you [had] to give her credit for that." CP at 168.

Sagastegui said that after he shot Sarbacher, he got up out of his chair and asked her "how it felt" and saw that she was already dead. CP at 169. He then went outside and asked Vera-Acevado the same question and saw that "all she was doing was gurgling." CP at 169. He then told her to "hurry up and die or something." CP at 169. Sagastegui told the detectives that he then took the rifle, got into the Sarbacher's black Ranger truck and drove to his home. Upon arriving home, he hid the rifle under the couch and then went to bed.

The detectives questioned Sagastegui about why he committed these crimes. Sagastegui responded that Sarbacher was "the worst mother in the world." CP at 170. He said that Kievan had been showing signs of being molested and he was "going to grow up to be a molester . . . and he was a bad kid anyway." CP at 171. Sagastegui told the detectives that the child "didn't deserve to die but . . . he had no supervision . . . [and] was probably going to grow up to be a murderer." CP at 171. Sagastegui went on to state that Vera-Acevado's death was a mistake. He indicated that the day following the murders, he did not realize what he had done until he "saw it on the news," maybe because "you want to black out things that are you know are bad." CP at 172.

Sagastegui acknowledged that it "was kind of a thrill" to watch Sarbacher die, but that killing "the baby was sick." CP at 176, 177. When asked about molesting Kievan, Sagastegui said,

No, in fact I was[n't] even sexually aroused. I just started . . . beating on the kid. I wanted to snap his neck and I kept twisting it and twisting it and he . . . throwing him around . . . and I'm not even sexually arous[ed]. Then I figured . . . maybe I was getting off to this so I tried messing around with him and it wouldn't work . . . so . . . eventually it did, you know, but . . . I don't think, you know, I was out to molest the kid in the first place. I think, you know, it was just . . . I don't even know what it was but it was sick. I mean it was a different feeling than what I got from the mother. But the mother . . . I actually smiled and [ ] I think I almost got off on it.

CP at 177. Sagastegui added that "it felt . . . good" and that he started "thinking about going . . . to Food Pavilion with the rifle and just start shooting people" but that he "was a little tired so [he] went to bed." CP at 177.

Near the end of his interview with Sagastegui, the detectives asked him if there was anything he wanted to add. He answered that he felt sorry for his mother and that he wanted the detectives to "tell her before she [heard] it on the news." CP at 179.

## PROCEDURAL HISTORY

At a preliminary hearing held in Benton County Superior Court on November 21, 1995, Sagastegui indicated that he did not want to be represented by legal counsel. Nevertheless, after questioning Sagastegui about his level of education and his familiarity with the legal system, the judge presiding at the hearing appointed counsel to assist him.[2]

On November 22, 1995, Sagastegui was formally charged with three counts of aggravated murder in the first degree. In count I of the information, in which the State claimed that Sagastegui caused the death of Kievan with premeditated intent, the alleged aggravating circumstance was that there was more than one victim and the murders were part of a common scheme or plan. In counts II and III, in which

---

[2]The colloquy between the trial court and Sagastegui was as follows:

"The Court:     What is your level of education?

"Mr. Sagastegui:     G.E.D.

"The Court:     Have you ever had to represent yourself before?

"Mr. Sagastegui:     No.

"The Court:     Have you ever watched a court proceeding?

"Mr. Sagastegui:     Several times.

"The Court:     Have you watched a trial from beginning to end?

"Mr. Sagastegui:     Several times.

"The Court:     Have you taken part in any trials?

"Mr. Sagastegui:     Several.

"The Court:     Do you understand that there are rules of evidence that might apply?

"Mr. Sagastegui:     Umm, I know there is evidence, if that's what you're talking about." RP at 4 (11/21/95).

it claimed that Sagastegui premeditatedly caused the death of Melissa Sarbacher (count II) and Lisa Vera-Acevado (count III), two aggravating circumstances were alleged: (1) that there was more than one victim and the murders were part of a common scheme or plan, and (2) that Sagastegui committed the murders of Sarbacher and Vera-Acevado to conceal commission of the murder of Kievan.

At his arraignment on December 1, 1995, Sagastegui reiterated his desire to represent himself. Despite expressing concerns about this request, the trial court indicated that Sagastegui could represent himself and, consequently, it changed the status of Sagastegui's defense counsel to "stand-by."[3] The prosecuting attorney gave oral notice at this hearing that the statutory 30-day period within which the State had to decide whether it would seek the death penalty in the case had commenced. The trial court then informed Sagastegui and his stand-by counsel that Sagastegui had the right to present any mitigating evidence to the prosecutor that they believed would be relevant on the question of whether the State should seek the death penalty.

At the outset of an omnibus hearing on December 15, 1995, the trial court indicated that it intended to engage in an extensive discussion with Sagastegui about self-representation. It said:

> While you're considering that with your counsel, the Court would only indicate to you at this time that these are — these are obviously big-time charges filed here. The prosecution is considering the death penalty.
>
> You have available to you a very experienced criminal defense attorney who would provide you with the best repre-

---

[3]At this hearing the trial court indicated:

"Mr. Sagastegui, the more frequently I have the opportunity to talk to you, the more concerned I become. The stakes in this case are very high, and I believe you need the full assistance of an attorney, and I am fast approaching the point where I am going to appoint Mr. Egan to represent you fully."

Sagastegui responded:

"Well, thanks for your concern, but I'm not interested." RP at 5 (12/1/95).

sentation possible so that, you know, you can consider that among everything else while you're making your decision here.

RP at 9 (12/15/95). Following this admonition, the hearing was recessed. It was resumed again on December 18, 1995, at which time the trial court inquired into the issue of self-representation, and questioned Sagastegui extensively about his knowledge of the law and his understanding of the difficulties and pitfalls of self-representation. During this hearing, the judge attempted to dissuade Sagastegui from proceeding without benefit of counsel, saying:

> I must advise you that in my opinion, you would be far better defended by a trained lawyer than by yourself. I think it unwise of you to represent yourself. You are not familiar with the law; you are not familiar with court procedure; you are not familiar with the rules of evidence. I would strongly urge you not to try to represent yourself.

RP at 6-7 (12/18/95). The trial court then asked Sagastegui, "[I]n light of the penalty that you might suffer if you are found guilty and in light of all the difficulties in representing yourself, is it still your desire to represent yourself and to give up your right to be represented by counsel?" RP at 7 (12/18/95). Sagastegui answered, "Yes." RP at 7 (12/18/95). At the conclusion of the exchange, the trial court found that "the defendant has knowingly and voluntarily waived his right to counsel," and concluded that Sagastegui could represent himself. RP at 13 (12/18/95).

The trial court also asked Sagastegui at the hearing on December 18 if he understood that he could present mitigating evidence to the prosecutor. Sagastegui responded, "Yeah; I understand what he's asking for." RP at 31 (12/18/95). At a December 2, 1995 meeting between Sagastegui and the Benton County prosecuting attorney, the prosecutor reminded Sagastegui that he could present evidence of mitigating factors. According to the prosecutor, Sagastegui indicated that he did not intend to present mitigating evidence or seek more time within which to do so.

On December 29, the State filed a notice of special sentencing procedure, indicating that it intended to seek the death penalty. At a hearing on that date, information was presented to the trial court in the form of a written report and oral testimony which revealed that Sagastegui had stopped taking his prescribed medication (Vasotec for hypertension, Paxil for depression, and Pepcid for gastritis) and that he had exhibited unusual behavior in the jail.[4] Nevertheless, Sagastegui attempted to plead guilty to all three charges. The trial judge refused to accept his pleas, saying,

> In view of the serious nature of these charges coupled with the fact that there has been some deserving [sic] reports concerning Mr. Sagastegui's emotional condition while incarcerated here at this facility, it is the Court's opinion it is necessary that we determine whether Mr. Sagastegui is competent to actually enter a plea of guilty to the three charges now pending.

RP at 8 (12/29/95). The trial court then ordered that Sagastegui undergo a mental examination to assist it in determining if Sagastegui was competent to stand trial, represent himself, and enter a plea of guilty.[5] Sagastegui objected to such an examination, arguing that the trial court had previously determined that he was mentally competent. The trial court declined to rescind its order, informing Sagastegui that the new information which had been provided to it raised questions regarding his competency to enter pleas of guilty.[6]

Sagastegui then underwent a 15-day evaluation at

---

[4]According to the report furnished to the trial court, Sagastegui refused to allow officers to enter his cell by blocking the door and turning off the lights. It also indicated that he had sharpened his toothbrush into a "shank." Def.'s Ex. 1.

[5]This examination was authorized by RCW 10.77.060, which permits a court, upon its own motion, to order a mental examination of a criminal defendant if there is any reason to question the person's competency.

[6]The order originally included an additional request for an opinion as to Sagastegui's sanity on November 19, 1995 and as to his mental capacity to formulate the intent to commit the acts with which he was charged. This request was later struck from the order, following Sagastegui's assertion that he was not raising an

Eastern State Hospital. Upon its completion, he was returned to the trial court. Based on the report of that hospital's so-called "sanity commission," the trial court found Sagastegui competent to stand trial.[7] The commission's report was, however, sealed at Sagastegui's request. At a confession hearing held on January 23, 1996 pursuant to CrR 3.5, the trial court ruled that Sagastegui's confession to the Benton County Detectives was voluntary and that evidence of it, including a tape recording and transcript of the statement, was admissible evidence.

Trial on the charges against Sagastegui commenced on January 30, 1996 before the Honorable Carolyn A. Brown.[8] At the conclusion of jury selection, Sagastegui pleaded guilty to all three charges of aggravated first degree murder. Prior to accepting the pleas, the trial court went over Sagastegui's statements on plea of guilty with him.[9] A transcript of Sagastegui's recorded statement to Detectives Carlson and Carpenter was made part of the record as a factual basis for the guilty plea. Sagastegui conceded at the plea hearing that he had killed Melissa Sarbacher to conceal the commission of Kievan's murder, that "the State could prove without a doubt" that he killed Lisa Vera-Acevado to conceal Kievan's murder, and that all three killings were intentional, premeditated, and part of a common scheme or plan. RP at 741 (2/2/96).

The penalty phase of the trial commenced on February 5, 1996. During opening statements, Sagastegui told the jury that he "deserve[d] the death penalty and [he was] not giv-

insanity defense and that the evidence was, therefore, not admissible pursuant to RCW 10.77.030.

[7]The sanity commission consisted of three professionals at Eastern State Hospital: the program director of the Competency, Evaluation and Treatment program (a competency therapist); a licensed psychologist; and a licensed psychiatrist. Pursuant to RCW 10.77.060(1), the commission is to consist of at least two "qualified experts or professional persons."

[8]Judge Brown had presided at Sagastegui's preliminary hearing and at his arraignment. The Honorable Phillip M. Raekes presided at the omnibus hearing, as well as at hearings on December 15, 19, and 29, 1995, and January 3 and 4, 1996.

[9]Sagastegui submitted a separate statement of defendant on plea of guilty for each of the three counts.

ing any mitigating circumstances." RP at 780 (2/5/96). He also admitted committing the murders and stated, "I liked it. I enjoyed it." RP at 779 (2/5/96). The trial court then conducted a brief conference in chambers to ensure, once again, that Sagastegui understood he had the right to present mitigating evidence to the jury.

The State presented evidence to the jury which was consistent with the facts recited above, and which connected Sagastegui to the commission of the crimes to which he had pleaded guilty. The tape recording of Sagastegui's incriminating statements to the Benton County detectives was played to the jury and the jurors were furnished with a transcript of the statement.[10] The State also presented evidence to the jury of Sagastegui's prior convictions in courts of limited jurisdiction for using force against another (1991 and 1995), disturbing the peace (1995), driving with a suspended license (1995), and resisting arrest (1995). Sagastegui declined to present any evidence on his own behalf. During closing arguments, Sagastegui indicated to the jury once again, "I did something wrong. I deserve the death penalty. . . . I'm not sorry for what I did, and I don't know how to explain that, but I'm not." RP at 48 (2/12/96).

The jury returned an affirmative answer to the question, "[h]aving in mind the crime of which the defendant has been found guilty, are you convinced beyond a reasonable doubt that there are not sufficient mitigating circumstances to merit leniency?" RP at 55 (2/12/96). Consistent with the jury's verdict, the trial court sentenced Sagastegui to death.

At a hearing on March 11, 1996, the trial court considered Sagastegui's request to waive his rights to a general appeal and to the assistance of counsel for any review of his sentence. Prior to ruling on the request, the sentencing court required Sagastegui to answer a seven-page written questionnaire to ensure that he fully understood the consequences of his decision. It then questioned Sagastegui about his answers to each written question. The sentencing court

---

[10]At Sagastegui's request, the trial court excised from the tape recording and transcript Sagastegui's reference to his mother's address and telephone number.

also considered testimony from the members of the sanity commission who had earlier examined Sagastegui at Eastern State Hospital. The sentencing court thereafter entered findings of fact and conclusions of law to the effect that Sagastegui was mentally competent to validly waive his rights to appeal and to the assistance of counsel for both a general appeal and the mandatory statutory review of his sentence.[11] It found, additionally, that Sagastegui's decision to waive his rights to appeal and to have the assistance of counsel was made voluntarily, intelligently, and knowingly. RP at 88-89 (3/11/96).

## ANALYSIS

■■ Our review here is governed by RCW 10.95.130 and principles laid down by this court in *State v. Dodd*, 120 Wn.2d 1, 838 P.2d 86 (1992). Under *Dodd* we are required to evaluate the trial court's conclusion that Sagastegui's waiver of general appellate review was made knowingly, voluntarily, and intelligently. In the event we conclude that the waiver was valid, we must then consider the mandatory review questions posed by RCW 10.95.130 for our determination.

## I. WAIVER OF APPEAL

In *Dodd*, we were faced with a situation similar to that which confronts us here. The defendant in that case, Westley Allan Dodd, pleaded guilty to three counts of aggravated murder and declined to appeal his convictions or the sentence of death that was imposed. Although we held there that a competent defendant who is sentenced to death may waive general appellate review, we went on to say that we are required to (1) review the validity of the waiver, and

---

[11]Throughout the period of this court's review, Sagastegui has continued to have the assistance of standby counsel available to him.

(2) engage in the statutory review of the death sentence, regardless of the defendant's wishes, if the waiver is valid.[12]

■ For the purpose of reviewing the validity of the waiver, we adopted the test approved by the United States Supreme Court in *Whitmore v. Arkansas*, 495 U.S. 149, 165, 110 S. Ct. 1717, 109 L. Ed. 2d 135 (1990), which requires review of the trial court's determination, made following a hearing, that the defendant made a knowing, voluntary, and intelligent waiver of his right to appeal. Specifically, we must decide if the trial court erred in concluding that "the defendant had 'the capacity to understand the choice between life and death and to knowingly and intelligently waive any and all rights to appeal his sentence.' " *Dodd*, 120 Wn.2d at 22 (quoting *Whitmore*, 495 U.S. at 165). This requires us to determine if the record supports its holding that the defendant (1) had the capacity (or competency) to understand his options, and (2) was provided with the requisite information to enable him to make a knowing, voluntary, and intelligent decision to waive a general appeal.

### A. Sagastegui's Competency to Waive Appeal

Sagastegui, like Dodd, pleaded guilty to three counts of aggravated first degree murder, and waived general appeal of his death sentence. Before accepting Sagastegui's waiver, the Benton County Superior Court conducted the required hearing to determine if Sagastegui's waiver of his rights to

---

[12]Sagastegui has continued to voice opposition to having the assistance of counsel and to any review of his convictions and sentence. He stated in an affidavit presented to this court that, "I have never asked for an attorney to represent me. At trial the Court insisted that I have a 'stand by' attorney. I was given no choice in the matter. . . . The same is true for this mandatory appeal which I don't want but have been ordered to go through. . . . I want to represent myself . . . .

". . . .

". . . I deserve to die . . . .

"The only passion you should consider is my passion for killing. The only prejudice you should consider is your own prejudice against the death penalty. . . . Let's go; lets entertain the people." Def.'s Resp. to Supreme Ct. at 1-2.

appeal and to assistance of counsel for a statutory sentence review was valid.

At this hearing, the trial court heard extensive testimony from each member of the three person sanity commission who had examined Sagastegui at Eastern State Hospital shortly before he entered pleas of guilty to the charges against him. Each of these persons indicated that Sagastegui was mentally competent and that he understood the consequences of his decision. One member of the commission, Judith Corem, testified that Sagastegui appeared to understand the concept of death, and was able to articulate in a rational manner the difference between the death penalty and life imprisonment without the possibility of parole. Another commission member, Dr. Charles McIlroy, indicated that he had administered the Minnesota Multiphasic Personality Inventory test to Sagastegui during the time Sagastegui was being evaluated at Eastern State Hospital. Based upon the results of this and other psychiatric tests administered to Sagastegui, as well as background information and information obtained in clinical interviews of Sagastegui by McIlroy and other members of the commission, he concluded that Sagastegui "did not suffer from a major mental illness and also that he was quite capable of understanding questions asked of him and interacting and communicating about his case" and "that he was competent to stand trial and remains competent at this time." RP at 55-56, 58 (3/11/96). The third commission member, Dr. Veerne Cressey, testified that, "[i]n general, we felt he had a perfectly normal IQ and . . . we felt that his judgment or his intelligence was right in the normal range." RP at 81 (3/11/96).

The trial court, relying on these experts and its own dialogue with Sagastegui in open court, concluded that Sagastegui was competent to waive his rights to general appeal and to the assistance of counsel. In this regard, it found:

> [He] suffers from no major mental illness, disease or defect
> . . .

. . . .

[He] has the mental ability to adequately understand his legal rights, including his right to appeal and his right to the appointment of counsel on appeal and statutory sentence review . . .

[He] has the ability to make a reasoned choice among the alternatives . . .

. . . [He] engaged in an interactive discussion with the Court, providing deliberate, reasoned responses to the Court's questions.

Findings of Fact and Conclusions of Law Re: Def.'s Competency to Waive Counsel and Right to Direct Appeal at 2-3. The trial court also found that Sagastegui was mentally competent at all times during the proceedings and was able to fully appreciate his peril. We are satisfied that these determinations are fully supported by the record that is before us.

## B. Understanding of the Consequences of the Decision to Waive Appeal

Prior to the hearing on Sagastegui's request to waive a general appeal, the trial court required Sagastegui to answer a detailed questionnaire which was designed to shed light on his facility with the English language, his understanding of legal proceedings, and the consequences of his decision to waive his right to counsel and to a general appeal of the death sentence. Before accepting Sagastegui's waiver, the trial court read him each of the questions, required him to answer each one orally, and generally engaged him in a dialogue to ensure he understood everything.

Among the questions the trial judge asked Sagastegui, were the following: Did he understand that if he wanted an attorney to represent him, either on appeal or on the statutory sentence review, the court would appoint one for him? Did he understand that having the education, training and

skills of an attorney on appeal would be extremely beneficial and that if he acted as his own counsel he would have to write his own briefs and present his own arguments? Did he understand that he would not be granted access to the prison law library above that ordinarily granted to other inmates? Did he understand that if he did not have counsel that the court rules would apply to him the same as they apply to an attorney? Did he understand that failure to properly present a claim to the appellate court could bar that claim in any other challenge to his conviction or sentence? Did he understand that in that statutory sentence review, the Washington Supreme Court reviews only the death sentence and the review is limited to the four issues listed in RCW 10.95.130? Did he understand that by waiving the right to a direct appeal, he gave up the opportunity to raise any issues challenging his conviction as well as the opportunity to raise any issues challenging his death sentence other than those covered by the statutory sentence review? Did he understand that if he waived his right to a direct appeal, he may be forever barred from raising issues which he could have raised on direct appeal? Sagastegui's reply to these questions and to all others in the questionnaire indicated that he understood his position and the consequences of his decision to waive his right to counsel and appeal. At the conclusion of the colloquy between the trial court and Sagastegui, Sagastegui reaffirmed his desire to waive his right to appeal.

We are satisfied that the record supports the trial court's conclusion that Sagastegui made a "knowing, voluntary, and intelligent" decision to waive his right to appeal. Indeed, the record establishes that the trial court made significant efforts to discourage Sagastegui's waiver of appeal and scrupulously ensure that Sagastegui be provided with the information necessary to make an informed and intelligent decision to waive appeal. In sum, we hold that the evidence establishes that the trial court did not err in concluding that Sagastegui was competent to waive his right to appeal and that his decision to do so was made

knowingly, voluntarily, and intelligently. His waiver of general review was, therefore, valid.[13]

## II. MANDATORY REVIEW ISSUES

Having concluded that Sagastegui's waiver of his right to a general appeal was valid, we must next engage in a review of the death sentence. This review, as we have indicated above, is made mandatory by the provisions of RCW 10.95.130, which exists to make certain that: there was sufficient evidence to justify the jury's finding that there were not sufficient mitigating circumstances to merit leniency; the sentence of death is not disproportionate or excessive; the defendant was not mentally retarded; and the sentence was not brought about by passion or prejudice.

Prior to discussing these issues, however, we address an argument raised by amicus curiae. Amicus contends that the absence of a record fully developed through the adversarial process precludes this court from making a reasoned decision on the statutory issues. Amicus claims, additionally, that the absence of such a record did not permit it "to make principled arguments" on the statutory review questions because there was no "thorough and competent investigation" of the truth. Amicus Curiae Br. at 2. It urges us to vacate the death sentence and appoint as special counsel two lawyers who are learned in the law of capital punishment to conduct an investigation of evidence relevant to the mandatory review issues. These lawyers, amicus suggests, should then present the prosecuting attorney with evidence of mitigating circumstances or mental retardation, if any, in order that the prosecutor might reconsider his death penalty position. According to amicus, if the prosecuting attorney still wishes to seek the death penalty in the face of evidence marshaled by the appointed attorneys, and the trial court concludes Sagastegui is not

---

[13]While *Dodd* does not require us to determine the validity of the waiver of assistance of counsel on appeal, we note that the trial court did conclude at the same hearing that Sagastegui's waiver of assistance of counsel was knowing, voluntary, and intelligent. The record supports that determination as well.

mentally retarded, then a jury convened to consider the penalty should be presented with the evidence of mitigating circumstances by appointed counsel.

This argument is nothing more than a request that we overrule *Dodd* and hold that a competent defendant cannot elect to defend himself at a capital sentencing proceeding and decide to not present mitigating evidence to the jury.[14] Amicus claims we should do so because if the defendant is simply acting out a death wish, the court would be sanctioning suicide. We do not agree, and adhere to our holding in *Dodd* that a competent defendant retains the right to make this choice. Although Dodd had counsel at trial, like Sagastegui he pleaded guilty to the three counts of aggravated murder and then instructed his attorney not to present any mitigating evidence to the jury during the penalty phase. By affirming the jury's verdict, we necessarily held that a competent defendant may elect not to present mitigating evidence. Although we discussed the mitigating evidence that amici presented to this court for our review of the statutory issues, we did not hold that such evidence must be presented to the jury or to this court on review. *Dodd*, 120 Wn.2d at 25.[15]

Although we do not know for certain why Sagastegui did not present the jury with evidence of mitigating circumstances, one can easily think of reasons why he chose not to. He may have believed, for example, that there were no mitigating circumstances. Perhaps he was guided by a tactical reason — that the introduction of such evidence could lead to evidence that was not favorable to him. It is also possible that Sagastegui felt, as did the jury, that death

---

[14]Amicus's argument bears a resemblance to the position advanced by Justice Utter in his dissent in *Dodd*. *Dodd*, 120 Wn.2d at 30. Justice Utter indicated that the failure to review mitigating evidence would violate the Eighth Amendment to the United States Constitution unless tactical reasons existed for presenting no mitigating evidence. He favored remanding for a determination as to whether or not a tactical decision was made about the presentation of mitigating evidence.

[15]In a concurring opinion in *Dodd*, Justice Andersen indicated that if a defendant chooses not to introduce mitigating evidence and it is therefore not developed on the record before the sentencing court, it should not be discussed by the Supreme Court in reviewing the sentence. *Dodd*, 120 Wn.2d at 29-30.

is a just punishment for the crimes he committed. Indeed, he told the jury that he was not presenting evidence of mitigating circumstances because he "deserve[d] the death penalty." RP at 780 (2/5/96). It may also be that his decision was motivated by his stated belief that living in a cell for the rest of his life would be worse punishment than the death penalty. Regardless of his reasons, in the final analysis Sagastegui was competent and he made an informed decision to represent himself and not present mitigating evidence. It is not the province of this court to override the constitutional right of a fully informed and competent person to direct the course of his own defense. That precise view was taken by the Ninth Circuit Court of Appeals in *Langford v. Day*, 110 F.3d 1380 (9th Cir. 1996), a case in which it reviewed the United States District Court's denial of a petitioner's request for habeas corpus relief. The court held there that a Montana state trial court was justified in respecting a defendant's instructions at a capital case that no mitigating circumstances be presented. The court said:

> We conclude that, when the defendant and his counsel ask the court to find no mitigation, the Eighth Amendment does not require the sentencing court to search the record in order to evaluate and discuss specifically less-than-substantial unenumerated mitigating factors neither offered nor pointed out as mitigating at the time of sentencing.

*Langford*, 110 F.3d at 1392. Consistent with that reasoning, if the court is not required to search the record and discuss unenumerated mitigating factors, it should not be faulted for not appointing counsel, over the defendant's objection, to seek out mitigating factors that are not in the record in order to call them to the court's attention.[16]

Amicus contends that Sagastegui has manipulated the record, thereby precluding a fair analysis of the mandatory

---

[16]*But see State v. Koedatich*, 112 N.J. 225, 548 A.2d 939 (1988), in which the Supreme Court of New Jersey concluded for policy reasons that it would not accept a knowing and voluntary waiver of the right to present mitigating circumstances.

sentence review questions. This argument assumes, contrary to *Dodd*, that a competent defendant is required to present any available mitigating evidence. Our ability to make a reasoned decision on the statutory review questions does not depend upon the manner in which Sagastegui—or any other defendant—exercises his constitutional right to control his defense. We conduct the statutory review based on the record as a whole, including in this case Sagastegui's guilty pleas and all of the evidence the State presented to the jury during the sentencing phase. The absence of mitigating evidence does not preclude or inhibit review. It is, in essence, an admission by Sagastegui that there are no mitigating circumstances that would merit leniency and we should respect that admission. A competent defendant, in our view, may elect to make such an admission, just as he may elect to plead guilty, whether or not amicus or any other person would have made the same decision.

## A. Sufficiency of Evidence

Pursuant to RCW 10.95.130(2)(a) we must answer the following question:

> Whether there was sufficient evidence to justify the affirmative finding to the question: Having in mind the crime of which Sagastegui has been found guilty, are you convinced beyond a reasonable doubt that there are not sufficient mitigating circumstances to merit leniency?

CP at 144.

The test to be applied in answering this question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found sufficient evidence to justify imposition of the death penalty beyond a reasonable doubt. *State v. Gentry*, 125 Wn.2d 570, 654, 888 P.2d 1105 (1995); *State v. Lord*, 117 Wn.2d 829, 906, 822 P.2d 177 (1991).

As we have noted above, the State presented extensive

evidence during the sentencing phase of the trial regarding the nature of the charged crimes, and Sagastegui's connection to the offenses. It also presented evidence about Sagastegui's prior convictions. Sagastegui, as we have also observed, declined to present any evidence of mitigating factors to the jury. Indeed, in his opening statement to the jury, he admitted committing the murders and stated that he liked it and "enjoyed it." RP at 779 (2/5/96). Given the brutal and callous nature of the crimes to which Sagastegui freely admitted, and the dearth of mitigating evidence, it can easily be said that there is sufficient evidence in the record to support the jury's finding that there are not sufficient mitigating circumstances to merit leniency.

██ ██ Even broadening our review to consider evidence that is in the record but not presented to the jury, as we did in *Dodd*, we reach the same result. The only evidence that could even, arguably, be considered mitigating is contained in a psychological report presented to the trial court by the sanity commission.[17] In light of Sagastegui's request that this report be sealed, we cannot discuss specific details within it. It is sufficient to say that we have reviewed the report and conclude that it does not weigh in favor of extending leniency to Sagastegui. Furthermore, the mere presence of mitigating factors does not require that the jury grant leniency, if the jurors are convinced that all the circumstances of the crime outweigh the mitigating factors. *State v. Rice*, 110 Wn.2d 577, 624, 757 P.2d 889 (1988). We are satisfied here that any mitigating factors in the record are counterbalanced by the aggravating factors and none is so compelling as to affect a rational juror's verdict. In short, as we said in *Dodd*, "[e]ven if the jury had considered the alleged mitigating evidence, it is

---

[17]During the sentencing phase of the trial, the prosecutor, apparently concerned about Sagastegui's failure to present mitigating evidence, informed the trial court that although the report from the sanity commission contained some information that might be construed as mitigating evidence, it also contained information that could be used to rebut such evidence.

obvious it would not have changed its verdict." *Dodd*, 120 Wn.2d at 25.[18]

### B. Proportionality

██ ██ We are also required by RCW 10.95.130(2)(b) to determine "[w]hether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and [Sagastegui]?" The purpose of conducting this proportionality review is to ensure that the death sentence is not imposed in a "wanton and freak-ish" manner. *State v. Pirtle*, 127 Wn.2d 628, 688, 904 P.2d 245 (1995); *State v. Brett*, 126 Wn.2d 136, 211, 892 P.2d 29 (1995). In conducting this review we are to make compari-sons to "similar cases" defined by RCW 10.95.130(2)(b) as "cases reported in the Washington Reports or Washington Appellate Reports since January 1, 1965, in which the judge or jury considered the imposition of capital punishment regardless of whether it was imposed or executed, and cases in which reports have been filed with the supreme court under RCW 10.95.120." In comparing this pool of cases, we are to look at four factors: (1) the nature of the crime, (2) the aggravating circumstances, (3) the defendant's criminal history, and (4) the defendant's personal history. *State v. Stenson*, 132 Wn.2d 668, 759, 940 P.2d 1239 (1997), *cert. denied*, 118 S. Ct. 1193 (1998); *State v. Brown*, 132 Wn.2d 529, 555-56, 940 P.2d 546 (1997), *cert. denied*, 118 S. Ct. 1192 (1998).

██ The purpose of this inquiry is not to ensure that there is no variation on a case-by-case basis, nor is it to guarantee that the death penalty is always imposed in superficially similar circumstances. *Lord*, 117 Wn.2d at 910. Requiring such precise uniformity, as we noted in

---

[18]Dodd, like Sagastegui, chose not to present any mitigating evidence to the jury. Amici in that case pointed to evidence that they believed was mitigating: Dodd's participation in a school band where he was well-liked and trusted by instructors; his parents argued frequently and eventually divorced in 1977; his father once attempted suicide; he was physically inept and often was laughed at at school; and he once cried because he didn't like molesting children. *Dodd*, 120 Wn.2d at 25.

*Lord*, would effectively eliminate the death penalty. Instead the court is to look for "overlapping similarities" and "family resemblances" between cases. *Lord*, 117 Wn.2d at 911.

This case most closely resembles *State v. Dodd*, 120 Wn.2d 1, 838 P.2d 86 (1992). Dodd, like Sagastegui, murdered three victims in an "extraordinarily vicious and cold-blooded manner." *Dodd*, 120 Wn.2d at 27. Two of Dodd's victims also suffered for a significant length of time before expiring. In the instant case we know from Sagastegui's statement to the Benton County detectives that Sarbacher was screaming and there was "terror in [her] eyes" after she was shot. CP at 168. It is reasonable to assume that the child victim, Kievan, also suffered considerably during the process of being beaten, raped, stabbed, and drowned. Other similarities between this case and *Dodd* are the absence of significant mitigating factors and the existence of more than one aggravating factor.

Sagastegui's case also closely resembles *State v. Campbell*, 103 Wn.2d 1, 691 P.2d 929 (1984) and *State v. Rice*, 110 Wn.2d 577. Campbell, like Sagastegui, killed three victims, one of whom was a child. Other similarities were that Campbell presented no mitigating evidence to the jury, and there were multiple aggravating factors. *Rice* also bears a resemblance to this case in that Rice murdered a family of four, including two children, and more than one aggravating factor was present.

Not surprisingly, differences exist between Sagastegui's case and the other cases mentioned above. Dodd, for example, preyed exclusively on children and the number of aggravating factors present in that case and in the *Campbell* and *Rice* cases exceeded the number here by one. That latter fact, while seemingly significant, is not conclusive because we have consistently declined to look at these cases as would a scientist looking for identity points. *Lord*, 117 Wn.2d at 910. Death penalty cases are unique and cannot be decided like a mathematical problem. While certainly the number of aggravating factors and victims present in a case are points of comparison, they are not determinative.

Indeed, in *State v. Benn,* 120 Wn.2d 631, 845 P.2d 289 (1993), a case in which we affirmed the death penalty, the number of aggravating factors and the number of victims was less than here.

The *Campbell* and *Rice* cases also differ in that the defendants in each of the two cases had significant criminal records, whereas Sagastegui's record was not substantial. Lack of a significant criminal record does not, however, render a sentence disproportionate. The defendant in *State v. Rupe,* 108 Wn.2d 734, 743 P.2d 210 (1987), had no criminal history, was sentenced to death and this court affirmed the sentence.[19] *Dodd* closely resembles Sagastegui in this regard as well in that Dodd's criminal record, like Sagastegui's, was not extensive. In sum, we are satisfied, after comparing Sagastegui's case to the cases mentioned above in which the death sentences were found to be proportional, as well as to those cases which have since been added to the pool of potentially similar cases, that the sentence of death imposed here is neither excessive nor disproportionate.

## C. Passion or Prejudice

The third inquiry required under RCW 10.95.130 is whether the sentence of death was brought about through passion or prejudice. RCW 10.95.130(2)(c). To answer this question, we are to examine the record for evidence that the jury's decision to impose the death penalty was affected by passion or prejudice. *See Benn,* 120 Wn.2d at 693; *Lord,* 117 Wn.2d at 915. Our review of the record discloses no evidence that the jury violated the trial court's instruction to "not be influenced by passion [or] prejudice." CP at 147. Indeed, Sagastegui had not suggested here or at trial that the jury was inflamed by passion or prejudice other than to point out in closing argument that he "saw one or two of you [jurors] smiling when it was time to see those pictures."

---

[19]Rupe's death sentence has since been overturned by the Ninth Circuit Court of Appeals for reasons unrelated to proportionality. *Rupe v. Wood,* 863 F. Supp. 1315 (W.D. Wash. 1994), *aff'd,* 93 F.3d 1434 (9th Cir. 1996).

RP (2/12/96) at 48. Even if the observation was accurate, it does not establish that the verdict was affected by passion or prejudice.

Amicus calls our attention to the report the trial court compiled pursuant to RCW 10.95.120, which indicates that none of the jurors was of the same race as Sagastegui and that all were of the same race as the three victims. These facts without more do not cast doubt on the verdict. The fact remains that the jury heard overwhelming evidence justifying a death sentence. In light of Sagastegui's failure to present any evidence in mitigation and his seeming endorsement of the death penalty for himself, the jury had little choice but to reach the decision it did.

### D. Mental Retardation Under RCW 10.95.030(2)

The final inquiry under RCW 10.95.030 is whether the defendant is mentally retarded as that term is defined in RCW 10.95.030(2)(a).[20] This inquiry was added in a 1993 amendment to RCW 10.95 that forbids execution of the mentally retarded. LAWS OF 1993, ch. 479, §§ 1-4. The defendant has the burden of proving he is retarded, and expert testimony is required to meet this burden by a preponderance of the evidence. RCW 10.95.030(2).

There is absolutely no evidence in the record that Sagastegui is mentally retarded. The only evidence in the record directly bearing on the issue was the testimony of Dr. Cressey, a member of the sanity commission, who had examined Sagastegui at Eastern State Hospital. As noted above, he indicated at the hearing at which Sagastegui's waiver of his right to appeal was considered that Sagastegui had a normal intelligence quotient and that his judgment and intelligence were also in the normal range. More

---

[20]RCW 10.95.030(2)(a) defines mentally retarded as:

"(a) 'Mentally retarded' means the individual has: (i) Significantly subaverage general intellectual functioning; (ii) existing concurrently with deficits in adaptive behavior; and (iii) both significantly subaverage general intellectual functioning and deficits in adaptive behavior were manifested during the developmental period."

to the point, he went on to say that he had no concerns that Sagastegui may be mentally retarded.

## CONCLUSION

If there was ever a case that justified the imposition of the death penalty, this is it. Not only did Jeremy Sagastegui freely and voluntarily plead guilty to three counts of premeditated murder and concede the existence of two aggravating circumstances, the evidence presented to the jury overwhelmingly established that there are no circumstances that merit leniency. The evidence showed, rather, that Sagastegui premeditatedly and viciously assaulted, raped, and murdered a defenseless three-year-old boy who was in his care, and then in a seemingly casual manner snuffed out the life of the child's mother and the mother's friend simply because they might identify him. Fortunately, this activity apparently caused Sagastegui to feel fatigued or he might have continued to wreak his form of mayhem at the Food Pavilion.

While one might question Sagastegui's decision to decline counsel at trial and on review, and to waive his general appeal, a defendant has the right to make such decisions if he is competent and fully informed. The record fully supports the trial court's findings that Sagastegui was competent and fully informed of his rights to counsel and to appeal. That being the case, we must respect his decision.

One feels compelled to search the record for some explanation for Sagastegui's barbaric conduct or for evidence that, after having an opportunity to reflect on his conduct, Sagastegui is now repentant. A reader of this record will search in vain for any explanation. Sagastegui's own admission to the jury reveals that he is totally without remorse. Indeed, his attitude has not changed since the time of trial, the defendant having advised this court in an unsolicited submission that:

> I got a thrill out of the killing. It gave me a great sense of power. I liked it. I'd like to do it again. I told this to the jury

and now I am telling you. . . . I pled guilty because I am guilty.
Pay attention. Don't you get it, I killed, I loved it, I want to do
some more.

Def.'s Resp. to Supreme Ct. at 1.

Under RCW 10.95.140, we are required to "affirm the
sentence of death and remand the case to the trial court
for execution" if we answer the first of the questions posed
to us in that statute in the affirmative and the other three
questions in the negative. We answer them that way and,
therefore, affirm the judgment and sentence.

DURHAM, C.J., and DOLLIVER, SMITH, GUY, JOHNSON, MADSEN,
TALMADGE, and SANDERS, JJ., concur.