[No. 67342-0. En Banc.]
Argued November 9, 2000. Decided July 5, 2001.

THE STATE OF WASHINGTON, *Respondent*, v. JAMES HOMER ELLEDGE, *Appellant*.

*James Elledge*, pro se.

*William A. Jaquette III*; and *Thomas M. Kummerow* (of *Washington Appellate Project*), for appellant.

*James H. Krider, Prosecuting Attorney*, and *Seth Aaron Fine, Deputy*, for respondent.

*Carl G. Sonderman* and *Paul J. Wasson II*, amici curiae.

MADSEN, J. — James Homer Elledge pleaded guilty to one count of aggravated first degree murder in Snohomish County Superior Court. A special sentencing jury concluded there were insufficient mitigating circumstances to merit leniency, and the trial court sentenced him to death. Elledge waived his right to a direct appeal and asserts before this court that he wishes to be executed. We appointed amicus to brief the statutory review criteria enumerated in RCW 10.95.130. We affirm Elledge's sentence of death.

## FACTS

### a. Facts of the Crime

On the afternoon of April 18, 1998, James Elledge invited Eloise Fitzner and her friend, S.C., for a night out, promising them gifts and dinner.[1] Verbatim Report of Proceedings (RP) at 1547; Ex. 43. They arranged to meet at Elledge's church, the Lighthouse Methodist Church in Lynnwood, Washington, at around 8:30 P.M. When Ms. Fitzner and S.C. arrived Elledge gave them a brief tour of the church, during which they met the pastor. After the pastor left, Elledge continued with the tour. Eventually, he guided the two women to Room 102, a bible study room with risers around its perimeter. After they entered the room, Elledge closed the door, pulled out a knife, and told Ms.

---

[1] S.C. is a surviving victim in this case.

Fitzner "that [he] didn't appreciate what she had done about a year ago, as far as trying to mess the marriage up between [he] and [his] wife." Ex. 43; RP at 1549.

Elledge and Ms. Fitzner were former neighbors in the same apartment complex. Approximately one year earlier, Ms. Fitzner wrote a letter to Elledge's then girl friend, urging her to "[not] stay with that awful man any more," and asserting that "[Elledge] does not even love you" and that "he is just using you for sex, and because he needs the income from your job." Ex. 4. The letter further accused Elledge of making sexual advances toward Ms. Fitzner. *Id.* At some point, shortly after Elledge's girl friend received the letter, Elledge read it.

Despite the letter, Elledge and his girl friend later married, but Elledge did not forget about the letter. In Elledge's words:

I had been carrying around . . . anger inside of me for over a year [and it] just got to the top and it just spewed out.

. . . .

That Saturday. Uh, I don't know, twelve, twelve-thirty, something like that was when this whatever it is inside of me came out. The rage uh whatever it is.

Ex. 43.

That rage led to a decision to murder Ms. Fitzner. *Id.* Elledge went to Fred Meyer to buy some rope, visited the church to prepare for the murder, and wrote two letters, one to his wife and the other to his employer. *Id.*; RP at 1603-04. As Elledge stated, "[i]t was premeditated . . . [t]he whole thing was." Ex. 43.

After Elledge confronted Ms. Fitzner in the prayer/bible study room, he bound the two women's wrists and ankles with nylon cord. Ex. 43. He then put S.C. on an upper riser, placed a black sweatshirt over her head, and had her face the wall. RP at 1549. Elledge placed a Bible next to S.C., telling her it would keep her safe. RP at 1550. S.C. could hear a struggle and peeked a few times, noticing Elledge ripping off a piece of duct tape on one occasion. When

Elledge caught S.C. looking he told her to turn around or she would be next. RP at 1551. The last words heard from Ms. Fitzner were, "No, stop, I can't breathe," as Elledge placed a strip of duct tape over her mouth. *Id.* Elledge then manually strangled Ms. Fitzner. Ex. 43.

Elledge then dragged Ms. Fitzner underneath the riser. In his taped confession, he explains his next actions:

> Uh, after I ??? choked her to death, uh there appeared to be some kind of movement still going on with the body. I guess that the body was just settling or something but I didn't uh want to take any chances and I put a knife in her neck.

Ex. 43.

Immediately thereafter, Elledge covered up Ms. Fitzner's body with "several blankets and shirts" and placed "boxes and packages and stuff like that on top of her." *Id.* The medical examiner testified that either the strangulation or stabbing injury alone would have caused Ms. Fitzner's death and that she was probably alive when she was stabbed, but may have been unconscious.

Elledge then fled the scene, took Ms. Fitzner's car, abducted S.C., and drove to his home. The next day, Elledge drove S.C. to her vehicle and released her, threatening he would find her if she contacted the police. Immediately upon her release, S.C. contacted the authorities and an investigation began. Police located Ms. Fitzner's abandoned car in Tacoma on the morning of April 21. On the same day, Elledge telephoned the police from a Tacoma hotel room and surrendered.

Tacoma police detained Elledge and detectives from Lynnwood came to Tacoma to interview him. The detectives informed Elledge of his *Miranda* rights, and obtained a written and oral waiver. *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). Elledge confessed to killing Ms. Fitzner, describing the crime in great detail. Elledge stated the reason for making his confession, and recounted his mental state at the time leading up to the killing.

[T]he thing is uh I've already been convicted once of a first degree murder and I'm still on parole for that. Uh, the Parole Board is obviously gonna revoke my parole uh and that is still carrying a life sentence . . . [s]o I don't feel that I have anything to uh gain or lose by holding back . . . . I've already made my bed, now I've gotta sleep in it the rest of my life . . . .

. . . .

I don't really think I'm looking for any you know kind of insanity plea or anything like that but I'm just saying that there's something wrong with my nature. I don't know where it comes from or what it is uh, but at times uh this particular type of nature comes up in me uh, an evil that I can't control uh. This happened several times in the past few years but I had been able to control a lot of it by uh power or prayer. I am a Christian but this particular time, Saturday, uh, it was just something I couldn't control.

Ex. 43.

*b. Procedural History*

On April 24, 1998, Elledge was charged by information with one count of aggravated first degree murder, based on the aggravator of kidnapping in the first degree. At his arraignment on April 28, 1998, the court entered a plea of not guilty on Elledge's behalf, and Elledge was held without bail. On May 27, 1998, the State filed an amended information and a notice of special sentencing seeking the death penalty. That same day, Elledge entered a plea of guilty. The following typewritten statement was included in his guilty plea:

On April 18, 1998, in Snohomish County, Washington, with the intent to inflict bodily injury upon Eloise Fitzner, I tied up both she and S.C. (DOB 11/01/58) and held them in a place where they were not likely to be found, and threatened them both with the use of deadly force, and in the course of and in furtherance of such crime, I choked Eloise Fitzner and stabbed Eloise Fitzner with the premeditated intent to kill her . . . .

Clerk's Papers (CP) at 226.

Elledge acknowledged the above statement in open court and the trial judge assessed Elledge's competency, as well

as the voluntariness of his plea. The court accepted the plea, found Elledge guilty, and scheduled a jury sentencing proceeding for June 19, 1998. Following several continuances, voir dire began on September 30, 1998. The majority of the venire panel was informed that Elledge would not be contesting the death penalty.

A special sentencing proceeding commenced on October 20, 1998. Following an opening statement by the prosecution (the defendant reserved), the State presented its case. Three witnesses were called. First, Detective Jim Nelson, the lead detective on the case, provided general testimony regarding the crime. Second, Dr. Daniel Selove, the medical examiner, presented testimony regarding the autopsy and examination of Ms. Fitzner, as well as the cause of her death. Finally, the State called Michael Helland, Ms. Fitzner's brother, who provided victim impact testimony.

Following the State's presentation, Elledge's attorney gave an opening statement and introduced Elledge, who delivered a statement of allocution. Elledge expressed remorse for the killing, but asked the jury to impose the death sentence asserting that "this wicked part of me needs to die." RP at 1721. On October 21, 1998, the jury returned with an affirmative answer to the question: "[h]aving in mind the crime of which the defendant has been found guilty, are you convinced beyond a reasonable doubt that there are not sufficient mitigating circumstances to merit leniency." CP at 34.

That same day, the trial court sentenced Elledge to death. Elledge was apprised of his right to appeal, which he waived. Before this court, both Elledge and the State advocate affirmance of Elledge's death sentence. We appointed amicus to brief the mandatory statutory review criteria enumerated in RCW 10.95.130. We affirm Elledge's sentence of death.

## ANALYSIS

Elledge waived his right to appeal both his conviction and

sentence. CP at 7-11. As such, the scope of this court's review is guided by *State v. Sagastegui*, 135 Wn.2d 67, 954 P.2d 1311 (1998) and *State v. Dodd*, 120 Wn.2d 1, 838 P.2d 86 (1992).

█ First, we must determine whether Elledge's waiver of his right to appeal was made "knowingly, voluntarily, and intelligently." *Sagastegui*, 135 Wn.2d at 82; *Dodd*, 120 Wn.2d at 18. If it was, we must next conduct the statutory review mandated by RCW 10.95.130, which requires us to answer four questions: (1) Was there sufficient evidence to justify the finding that there were not sufficient mitigating circumstances to merit leniency; (2) Was the sentence of death excessive or disproportionate to the penalty imposed in similar cases; (3) Was the sentence of death brought about through passion or prejudice; and (4) Was the defendant mentally retarded?[2]

## I. WAIVER OF APPEAL

█ For purposes of assessing the validity of a waiver of the right to appeal this Court utilizes the test approved by the United States Supreme Court in *Whitmore v. Arkansas*, 495 U.S. 149, 165, 110 S. Ct. 1717, 109 L. Ed. 2d 135 (1990). *Sagastegui*, 135 Wn.2d at 83 (citing *Whitmore*). This requires "review of the trial court's determination, made following a hearing, that the defendant made a knowing, voluntary, and intelligent waiver of his right to appeal." *Id.* Specifically, we must assess whether the trial court erred in concluding that "the defendant had 'the capacity to understand the choice between life and death and to knowingly and intelligently waive any and all rights to appeal his sentence.'" *Dodd*, 120 Wn.2d at 22 (quoting *Whitmore*, 495

---

[2] Amicus argues that this court is constitutionally mandated by article I, section 14 of the Washington Constitution and the Eighth Amendment to the United States Constitution to engage in a more expansive review of Elledge's case than that set forth in RCW 10.95.130. *See* Amicus Br. at 11-22. We rejected this exact argument in *Dodd* and we do so again today. *State v. Dodd*, 120 Wn.2d 1, 20, 22, 838 P.2d 86 (1992) (holding that neither the Eighth Amendment nor article I, section 14 mandates appellate review beyond the statutory criteria of RCW 10.95.130 if there is a valid waiver by the defendant).

U.S. at 165). As we stated in *Sagastegui*,

> This requires us to determine if the record supports its holding that the defendant (1) had the capacity (or competency) to understand his options, and (2) was provided with the requisite information to enable him to make a knowing, voluntary, and intelligent decision to waive a general appeal.

*Sagastegui*, 135 Wn.2d at 83.

The record amply supports the conclusion that Elledge was competent to waive his right to appeal. In determining a defendant's competency this court has referred to myriad factors, including the defendant's demeanor, statements by the trial judge, statements by counsel, and psychiatric reports. *Dodd*, 120 Wn.2d at 23. Dr. Kenneth Muscatel, a clinical and forensic neuropsychologist, conducted a psychiatric evaluation of Elledge prior to entry of Elledge's guilty plea. In his sealed report, Dr. Muscatel candidly describes Elledge's mental condition, ultimately concluding that Elledge is competent to make informed decisions regarding the course of his defense.

Elledge's competency was also assessed by Judge Thibodeau at the time Elledge's guilty plea was entered on May 27, 1998. After engaging in an extensive colloquy with Elledge regarding his rights and the voluntariness of his plea, Judge Thibodeau asked Elledge's attorney for his opinion.

> THE COURT: Mr. Jaquette, there's no issue from your perspective as to the competency of the defendant in this particular case? He appears to be coherent and with me here this afternoon. Is there anything from your perspective that you would question at this time, sir?
>
> MR. JAQUETTE: No, Your Honor. Mr. Elledge is competent and we have had a number of intelligent conversations about this whole matter and I'm satisfied that he knows exactly what he's doing.
>
> THE COURT: There was an evaluation done, I assume, in this case?
>
> MR. JAQUETTE: There was.

THE COURT: And I would just ask that be made part of the record and will seal it at this point in time.

MR. TOWNSEND: The State will certainly be agreeable to that, Your Honor.

THE COURT: The Court would—yes?

MR. TOWNSEND: Your Honor, I'd also indicate on the competency issue that my office has received reports from the Department of Corrections in connection with Mr. Elledge's prior incarceration and those records would confirm the evaluation and observations by Mr. Jaquette, indeed, that Mr. Elledge has consistently been competent and of above-average intelligence.

RP (May 27, 1998) at 10-11.

In this case, unlike in *Dodd* and *Sagastegui*, the trial court did not call expert witnesses to testify as to the defendant's competency prior to making its determination that a valid waiver had occurred. *See Dodd*, 120 Wn.2d at 10-11; *Sagastegui*, 135 Wn.2d at 84-85. Nevertheless, following the sentencing proceeding the court did conduct an on the record hearing during which time Elledge was informed of his rights and options in appealing his conviction and sentence. The court also revisited the issue of Elledge's competence, and made a specific determination that Elledge's waiver was made "knowingly, voluntarily, and intelligently." *Sagastegui*, 135 Wn.2d at 82. After the court explained to Elledge his right to appeal, the following exchange occurred:

THE COURT: The question I have for you as it relates to the general appeal, you understand, of course, the difference between life and death and what's happening in this particular case, don't you?

THE DEFENDANT: Yes, I do.

THE COURT: You also understand that Mr. Jaquette has represented to this Court, according to Dr. Muscatel, that you are competent to do what you are doing here today. Do you understand that as well?

THE DEFENDANT: Yes.

THE COURT: In order to do this you must waive this right to

general appeal knowingly, intelligently, and voluntarily. Do you understand that?

THE DEFENDANT: Yes.

THE COURT: Similar to the same way we went through the plea, that you knowingly understood the plea, you voluntarily entered into it, and you were advised of all your rights. Do you understand that as well?

THE DEFENDANT: Yes, I do.

MR. JAQUETTE: I'd like to read [Elledge's written waiver] to the Court. I've gone over this with Mr. Elledge. I'm satisfied he understands what he's doing and that he is knowingly and intelligently waiving his right to a general appeal.

1. Article I, section 22, of the Washington State Constitution guarantees me the right to appeal my conviction and sentence.

2. If I choose to exercise my right to appeal, the Washington Supreme Court will review the record of the proceedings and determine if any legal errors have been made.

3. Since I am indigent, I have the right to have an attorney appointed to represent me. That attorney would review the complete record of this case and prepare a written brief detailing all possible claims of legal error in the proceedings and would present oral argument on my behalf.

. . . .

9. I do understand the difference between a life sentence and the death penalty.

 a. If I were to have been sentenced to life without the possibility of release or parole, I understand that I would serve the rest of my life in confinement . . . and that that sentence could not be deferred or suspended. . . .

 b. Because I have been sentenced to death the laws of Washington require that I be put to death by means of lethal injection unless I choose the lawful alternative of hanging.

10. Before my death sentence can be carried out, the laws of Washington (RCW 10.95.100 and 10.95.130) require that the Washington Supreme Court determine:

[Recitation of statutory review criteria]

With all of these facts in mind, I hereby waive my right to a general appeal of my conviction and sentence. . . .

MR. JAQUETTE: Mr. Elledge signed that in my presence. I'm satisfied he understands what he said.

THE COURT: Is that true? Anybody force or threaten you today, Mr. Elledge, to sign this particular document, sir?

[THE DEFENDANT]: No.[3]

THE COURT: Did you go over the document in detail with Mr. Jaquette?

THE DEFENDANT: Yes, I did.

THE COURT: Did he fully explain to you the ramifications of this particular document?

THE DEFENDANT: Yes, he did.

THE COURT: You are still comfortable and satisfied with this? This is really what you want to do here today?

THE DEFENDANT: Yes.

THE COURT: You want the Court to accept this waiver?

THE DEFENDANT: Yes.

THE COURT: The Court will file the waiver for the record.

RP at 1773-78.

We are convinced that the hearing, coupled with Dr. Muscatel's psychological report, is sufficient to satisfy the *Whitmore* test even in the absence of expert testimony. Indeed, the waiver hearing approved by the United States Supreme Court in *Whitmore* was less thorough than the one conducted in this case. In *Whitmore*

> [the defendant] was questioned by counsel and the trial court concerning his choice to accept the death sentence, and his answers demonstrate that he appreciated the consequences of that decision. He indicated that he understood several possible grounds for appeal, which had been explained to him by counsel, but informed the court that he was "not seeking any technicalities." In a psychiatric interview, Simmons stated that

---

[3] The verbatim report of proceedings attributes the answer "no" to Mr. Jaquette, Elledge's attorney. Given the fact that the question was directed specifically by the trial judge to Elledge, this would appear to be a typographical error on the part of the court reporter.

he would consider it "a terrible miscarriage of justice for a person to kill people and not be executed," and there was no meaningful evidence that he was suffering from a mental disease, disorder, or defect that substantially affected his capacity to make an intelligent decision.

*Whitmore*, 495 U.S. at 165-66 (citations omitted).

It is also notable that Elledge has been unequivocal in his intent to seek the death penalty since the time of his original guilty plea in May 1998. As recently as May 1999, Elledge filed another written waiver, this time with this court, urging this court to expedite execution of his death sentence.

We hold that Elledge's waiver of his right to appeal was made "knowingly, voluntarily, and intelligently." *Segastegui*, 135 Wn.2d at 82.

## II. MANDATORY REVIEW ISSUES

### A. Sufficiency of Evidence

■ As required by RCW 10.95.130(2)(a), we must determine whether there was sufficient evidence to justify the jury's determination that there were not sufficient mitigating circumstances to merit leniency. The test applied is whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found sufficient evidence to justify this conclusion beyond a reasonable doubt. *State v. Rice*, 110 Wn.2d 577, 623, 757 P.2d 889 (1988); *State v. Stenson*, 132 Wn.2d 668, 757, 940 P.2d 1239 (1997); *State v. Brown*, 132 Wn.2d 529, 551, 940 P.2d 546 (1997); *State v. Gentry*, 125 Wn.2d 570, 654, 888 P.2d 1105 (1995). We have explained our review process in the following manner:

> We *do not weigh the aggravating factors against the mitigating factors the way the jury did*; rather we consider the circumstances of the crime and any mitigating circumstances and determine whether a rational jury could have concluded that

mitigating circumstances do not outweigh the circumstances of the crime.

*Dodd*, 120 Wn.2d at 24-25 (citing *Rice*, 110 Wn.2d at 624-25). In addition to the circumstances of the crime, this court has looked to the defendant's criminal history in making its sufficiency determination. *Gentry*, 125 Wn.2d at 654.

■ This case is unique in that Elledge presented no mitigating evidence. In *Sagastegui* and *Dodd* we held "that a competent defendant may elect not to present mitigating evidence." *Sagastegui*, 135 Wn.2d at 88. *See also State v. Woods*, 143 Wn.2d 561, 608-09, 23 P.3d 1046 (2001). Amicus concedes this point and notes that "it is not an understatement to say there is no evidence of mitigating circumstance to merit leniency in the trial record." Amicus Br. at 23. Nevertheless, amicus urges this court to depart from its holdings in *Dodd* and *Sagastegui* and adopt a position whereby "special counsel" would be appointed to investigate and present mitigating evidence. *Id.* at 24 (citing *Sagastegui*, 135 Wn.2d at 87). In *Sagastegui* we rejected this same argument and we do so again today. *Sagastegui*, 135 Wn.2d at 88 ("This argument is nothing more than a request that we overrule *Dodd* and hold that a competent defendant cannot . . . decide to not present mitigating evidence to the jury.").

We believe the jury was justified in its determination. Elledge manually strangled and stabbed Ms. Fitzner. Indeed, as the medical examiner testified, the crime involved an element of torture, as Ms. Fitzner's "[s]uffering was both physical and psychological as strangulation was occurring . . . the fear of the terror of having your airway cut off, your—an assault occurring." RP at 1653. The crime was premeditated; Elledge had contemplated its commission for over a year. Ex. 43. However, the most significant aggravating circumstance in this case is Elledge's criminal record. Elledge was on parole for a prior first degree murder conviction at the time that he killed Ms. Fitzner. The following stipulation was read to the jury and provides an

accurate and objective description of Elledge's significant criminal background:

1. James Elledge was convicted of breaking and entering in Louisiana in 1953 at the age of 10 and was sent to a juvenile corrections facility.

2. He was convicted of another breaking and entering and a theft charge in Louisiana in September, 1954, and again was sent to a juvenile correctional facility.

3. He was also convicted of a theft charge in 1956 and once again placed in a juvenile corrections facility.

4. In 1964, at the age of 21, Elledge committed an armed robbery in October, 1964, in Roswell, New Mexico and was convicted thereof in February, 1965.

 The crime involved a robbery at a Western Union office, in the course of which he took the woman clerk hostage, hit her over the head with a gun rendering her unconscious, and poured gasoline on her.

 For this crime Elledge was sentenced to prison for a term of 10 to 50 years. He served 7-and-a-half years . . . .

5. While in prison he escaped. He was convicted of an attempt to commit a felony and was given a concurrent 2 to 10 year sentence.

6. Elledge was released from prison on parole in 1972.

7. In May, 1974, in Seattle, Washington, Elledge committed a murder and was convicted of first degree murder in April, 1975. He had killed 63 year old Bertha M. Lush by hitting her with a ball-peen hammer. Ms. Lush was the night manager of the El Dorado Motel where Elledge was staying and the killing occurred in the course of an argument over the rent.

 He received a life sentence with eligibility for parole for this crime.

8. Elledge remained in prison until July, 1989, when he was released on parole to live with his daughter in Ruston, LA.

9. His parole was revoked because of charges of attempted burglary of a bar in November, 1989, and he went back to prison until he was again paroled in April, 1994.

10. His parole was again revoked in September, 1994, and he went back to prison until he was again released in August, 1995.

RP at 1717-19.

Given the complete absence of any mitigating evidence, and the presence of several severe aggravating circumstances, we hold that the jury was justified in its determination that leniency was not merited.

### B. Proportionality

██ ██ RCW 10.95.130(2)(b) requires us to undertake a proportionality review in each capital case to determine "[w]hether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant."[4] The pool of similar cases includes those "reported in the Washington Reports or Washington Appellate Reports since January 1, 1965, in which the judge or jury considered the imposition of capital punishment regardless of whether it was imposed or executed, and cases in which reports have been filed with the supreme court under RCW 10.95.120." RCW 10-.95.130(2)(b). RCW 10.95.120 requires filing of reports "[i]n all cases in which a person is convicted of aggravated first degree murder." This includes those cases "in which the death penalty was sought and those in which it was not." *Brown*, 132 Wn.2d at 554.[5]

---

[4] Amicus raises several due process challenges to Washington's proportionality review based on *Harris ex rel. Ramseyer v. Blodgett*, 853 F. Supp. 1239 (W.D. Wash. 1994), *aff'd on other grounds*, 64 F.3d 1432 (9th Cir. 1995). In *Harris*, a federal district court judge held that this court's application of the statutorily mandated proportionality review in RCW 10.95.130 violates due process. As an initial matter, these arguments exceed the boundaries of this court's statutory review and are improperly raised by amicus. However, even if such arguments were properly raised, they have been previously rejected by this court in *In re Personal Restraint of Benn*, 134 Wn.2d 868, 952 P.2d 116 (1998). In *In re Benn* we explicitly rejected the district court's decision in *Harris* noting that "[t]he existence of an analytically flawed federal district court decision is not a compelling reason to vacate this defendant's death sentence or reconsider the proportionality review in his case." *Benn*, 134 Wn.2d at 928.

[5] Amicus contends that the pool of "similar cases" should include only those in which a sentence of death was ultimately affirmed. Amicus Br. at 48. This court

 Our proportionality review is guided by two fundamental goals: to avoid "random arbitrariness and imposition of the death sentence in a racially discriminatory manner." *Id.* at 555. Consistent with these objectives, we have noted that our proportionality review

> does not guarantee there will be no variations from case to case, nor that a sentence of death will be uniformly imposed in all *superficially* similar circumstances. Mathematical precision is unworkable and unnecessary. "There is no constitutional or statutory requirement to ensure an unattainable degree of identity among particular cases which are invariably unique." Instead, we must determine whether a death sentence has been imposed *generally* in similar cases, and not imposed *wantonly* and *freakishly*.

*Id.* (footnotes omitted).

In ascertaining whether a death sentence is disproportionate, and thus wantonly and freakishly imposed, we utilize a four part test that considers both the "crime and defendant" in relation to similar cases. The four factors are: " '(1) the nature of the crime, (2) the aggravating circumstances, (3) the defendant's criminal history and (4) the defendant's personal history.' " *State v. Elmore*, 139 Wn.2d 250, 308, 985 P.2d 289 (1999) (quoting *Brown*, 132 Wn.2d at 555-56).

### 1. Nature of the Crime

 Elledge manually strangled and stabbed Ms. Fitzner after binding her wrists and ankles. He had contemplated the crime for over a year. According to the medical examiner, Ms. Fitzner's "[s]uffering was both physical and psychological as strangulation was occurring . . . the fear of the terror of having your airway cut off, your—an assault occurring." RP at 1653. As we have stated previously, "[a]

---

has directly rejected this argument, noting that it will continue to utilize cases in which the death penalty was ultimately vacated, so long as the penalty determination was not overturned on the basis of the penalty being disproportionately imposed. *State v. Elmore*, 139 Wn.2d 250, 311 n.26, 985 P.2d 289 (1999). Along these same lines, amicus' argument that proportionality review is impossible unless the trial judge reports are updated to indicate that a sentence of death has been vacated is also rejected.

brutal murder involving substantial conscious suffering of the victim makes the murderer more deserving of the death penalty." *Stenson*, 132 Wn.2d at 759 (citing *Gentry*, 125 Wn.2d at 657).

Comparing this case with other "similar cases," it is apparent Elledge's crime was at least as vicious and brutal as others in which the death penalty was imposed, thus making it not disproportionate. *See* Report of the Trial Judge, *State v. Rupe*, No. 81-1-00316-1 (Thurston County Super. Ct. June 7, 1982) (single gunshot wound to the head, no torture); Report of the Trial Judge, *State v. Benn*, No. 88-1-01280-8 (Pierce County Super. Ct. June 12, 1990) (gunshot wounds to the head and trunk, no torture); Report of the Trial Judge, *State v. Charles Harris*, No. 84-1-01190-6 (Pierce County Super. Ct. Jan. 14, 1985) (gunshot wounds to the head and neck, no torture, contract killing).

2. Aggravating Circumstances

 Elledge pleaded guilty to one count of aggravated first degree murder based on the sole aggravator of kidnapping in the first degree. "[A] single aggravator will support the death penalty. . . ." *Elmore*, 139 Wn.2d at 309 (citing *Brown*, 132 Wn.2d at 558). This is the lowest number of aggravators possible and places this case in the very low range of the pool of similar cases in this category. However, we do not view this case as disproportionate in light of other cases in which the sentence of death was upheld based on a single aggravator. *See* Report of the Trial Judge, *State v. Gentry*, No. 88-1-00395-3 (Kitsap County Super. Ct. July 22, 1991); Report of Trial Judge, *Harris*; Report of Trial Judge, *Benn* (each finding the death penalty not disproportionate based on a single aggravating factor).

3. Defendant's Criminal History

Elledge's criminal history is extensive, consisting of convictions for four juvenile offenses and three adult felonies. Two of Elledge's adult felonies were violent: first degree murder and robbery. In *Gentry* we found a prior manslaughter conviction to be "particularly important" in conducting

our proportionality analysis. *Gentry*, 125 Wn.2d at 658.

In the pool of similar cases, only a small number of other defendants had a prior conviction for murder or manslaughter. *See State v. Vidal*, 82 Wn.2d 74, 508 P.2d 158 (1973) (two murders); *State v. Braun*, 82 Wn.2d 157, 509 P.2d 742 (1973) (each defendant had a prior murder conviction); Report of Trial Judge, *State v. Hughes*, No. 82-1-01979-4 (King County Super. Ct. Mar. 14, 1984) (murder); Report of Trial Judge, *State v. Benjamin Harris*, No. 84-1-01190-6 (Pierce County Super. Ct. Jan. 18, 1985) (manslaughter); Report of Trial Judge, *State v. Charles E. Harris*, No. 85-1-00093-1 (King County Super. Ct. Oct. 31, 1985) (murder); Report of Trial Judge, *State v. Williams* , No. 85-1-00158-3 (Mason County Super. Ct. Aug. 29, 1986) (murder); Report of Trial Judge, *State v. St. Pierre*, No. 84-1-00992-8 (Pierce County Super. Ct. July 22, 1987) (murder); Report of Trial Judge, *State v. Lord*, No. 86-1-00470-8 (Kitsap County Super. Ct. Sept. 10, 1987) (murder); Report of Trial Judge, *State v. Gentry*, No. 88-1-00395-3 (Kitsap County Super. Ct. July 22, 1991) (manslaughter); Report of Trial Judge, *State v. Finch*, No. 94-1-01113-2 (Snohomish County Super. Ct. July 24, 1995) (manslaughter); Report of Trial Judge, *State v. Roberts*, No. 94-C-03249-2 SEA (King County Super. Ct. July 14, 1997) (murder); Report of Trial Judge, *State v. Smith*, No. 96-1-00957-1 (Clark County Super. Ct. Sept. 28, 2000) (murder). Over half of these defendants were sentenced to death. *See Vidal, Braun, Benjamin Harris, Lord, Gentry, Finch, Roberts.*

Additionally, the penalty of death has been imposed in cases where the defendant had little or no violent criminal history. *See* Report of Trial Judge, *State v. Rupe*, No. 81-1-00316-1 (Thurston County Super. Ct. July 12, 1982) (no history); Report of Trial Judge, *State v. Mak*, No. 83-1-00504-0 (King County Super. Ct. Oct. 19, 1983) (no history); Report of Trial Judge, *State v. Bartholomew*, No. 81-1-00579-1 (Pierce County Super. Ct. Dec. 21, 1981)

(non-violent theft, trespass, possession of stolen property); Report of Trial Judge, *State v. Rice*, No. 85-1-01004-0 (King County Super. Ct. July 21, 1986) (lewd conduct, grand theft auto); Report of Trial Judge, *State v. Benn*, No. 88-1-01280-8 (Pierce County Super. Ct. June 12, 1990) (nonviolent thefts, grand larceny, numerous misdemeanors); Report of Trial Judge, *State v. Stenson*, No. 93-1-00039-1 (Clallam County Super. Ct. Aug. 19, 1994) (drug convictions).

 Elledge's criminal history is among the most extensive of any within the pool of similar cases "and shows a pattern of violence towards others." *Brown*, 132 Wn.2d at 559. This factor weighs very heavily in our holding that his sentence of death was not disproportionately imposed.

4. Personal History

There was no mitigating evidence presented to the jury in this case. In fact, Elledge, through his counsel, argued there were no mitigating circumstances to consider.

In sum, we have affirmed a verdict of death in cases with less brutal crimes and the same number of aggravating factors. Given the fact that Elledge's criminal record of violent offenses is among the most significant of all "similar cases," we hold that Elledge's sentence was not wantonly and freakishly imposed and therefore not disproportionate.

## C. Passion or Prejudice

Next, we must assess whether Elledge's sentence of death was brought about through passion or prejudice. RCW 10.95.130(2)(c). As an initial matter, the jury was instructed that it was not to be influenced by passion, prejudice, or sympathy. Nothing in the record indicates that this instruction was disregarded. *See Sagastegui*, 135 Wn.2d at 94 ("[o]ur review of the record discloses no evidence that the jury violated the trial court's instruction to 'not be influenced by passion [or] prejudice'" (alteration in original) (quoting Clerk's Papers at 147)). Second, Elledge, Ms. Fitzner, and all 12 jury members were Caucasian, so there

is no issue in this case as to racial bias.

Amicus contends that because Elledge's attorney and the State were both advocating imposition of the death penalty, the jury's verdict was "obviously brought about through passion or prejudice." Amicus Br. at 63. Specifically, amicus points to the admission of evidence relating to the facts of Elledge's prior criminal convictions, as well as admission of a letter from Elledge to his wife explaining the crime, as examples of how the adversarial process broke down. Amicus contends that admission of these evidentiary items was in violation of the rules of evidence and hence, because their admission was uncontested, the jury was influenced by passion or prejudice.

Initially, whether or not admission of these items of evidence violated the evidence rules is irrelevant in a case where a defendant has validly waived his right to appeal. The sole statutory question is whether the sentence was brought about through passion or prejudice, and therefore, the only issue before this court is whether the evidence was of the kind that could have produced this result. It was not.

In *Rice* we held that the State is generally entitled to admit evidence related to "the circumstances of the crime." *Rice*, 110 Wn.2d at 607. Indeed, in a death penalty case, the "very nature of the crime renders its narration an emotional event." *Id.* at 606. We have also held that a defendant's criminal history, both juvenile and adult, is admissible in capital sentencing proceedings. *State v. Pirtle*, 127 Wn.2d 628, 666-67, 904 P.2d 245 (1995). A broad exclusion of facts germane to the defendant's crime and background would impair the jury's ability to reach an informed decision as to whether the sentence of death should be imposed.

> "[A]t the penalty phase the jury decides a question the resolution of which turns not only on the facts, but on the jury's moral assessment of those facts as they reflect on whether defendant should be put to death. It is not only appropriate, but necessary, that the jury weigh the sympathetic elements of defendant's background against those that may offend the conscience."

*Rice*, 110 Wn.2d at 608 (quoting *People v. Haskett*, 30 Cal. 3d 841, 863-64, 640 P.2d 776, 790, 180 Cal. Rptr. 640 (1982)).

██ ██ Amicus further contends that because defense counsel argued in favor of imposition of the death penalty to the jury, the sentence was brought through passion or prejudice. We disagree. Arguments that courts characterize as improper appeals to passion or prejudice include arguments intended to "incite feelings of fear, anger, and a desire for revenge" and arguments that are "irrelevant, irrational, and inflammatory . . . that prevent calm and dispassionate appraisal of the evidence." BENNETT L. GERSHMAN, TRIAL ERROR AND MISCONDUCT § 2-6(b)(2), at 171-72 (1997); *see also Rice*, 110 Wn.2d at 608; *State v. Reed*, 102 Wn.2d 140, 145-46, 684 P.2d 699 (1984) (prosecutor referred to defendant as liar four times, stated defense had no case, and implied defense witnesses should not be believed because they were from out of town and drove fancy cars); *United States v. McRae*, 593 F.2d 700, 706 (5th Cir. 1979) (" 'turn him loose, and we'll send him down in the elevator with you and his gun' " (quoting final argument)). No such arguments were made in this case.

██ In this case, there was testimony, evidence, and argument likely to incite an emotional response on the part of the jury; however, it was limited to the circumstances of the crime and the criminal history of the defendant. *See State v. Brett*, 126 Wn.2d 136, 214, 892 P.2d 29 (1995) ("Arguments which may evoke an emotional response are appropriate if . . . restrict[ed] . . . to the circumstances of the crime."). There is no indication the jury was swayed by passion or prejudice.

### D. Mental Retardation under RCW 10.95.030(2)

The final statutory question is "[w]hether the defendant was mentally retarded within the meaning of RCW 10.95.030(2)," which provides:

"Mentally retarded" means the individual has: (i) Significantly subaverage general intellectual functioning; (ii) existing

concurrently with deficits in adaptive behavior; and (iii) both significantly subaverage general intellectual functioning and deficits in adaptive behavior were manifested during the developmental period.

RCW 10.95.030(2)(a). The defendant bears the burden of proving he is "mentally retarded" by a preponderance of the evidence, and expert testimony is required to meet this burden. RCW 10.95.030(2). Since Elledge does not contest his death sentence, he advances no affirmative argument on this issue.

■ Regardless of this burden, there is no evidence in the record that Elledge is mentally retarded. The most that amicus can contend is that Elledge's statement of allocution, as well as his taped confession, indicate he was suffering "from some sort of mental aberration or abnormality." Amicus Br. at 70. Specifically, amicus focuses on Elledge's statements that his killing of Ms. Fitzner was prompted by uncontrollable rage. Whether or not this is true, it clearly does not meet the statutory definition of mental retardation.

Indeed, all indications are that Elledge is of at least average intelligence. At Elledge's guilty plea hearing his lawyer assured the court that Elledge was "competent" and that they had engaged in a "number of intelligent conversations." RP (May 27, 1998) at 10. Furthermore, at the same hearing, the prosecutor noted that he had "received reports from the Department of Corrections . . . and those records would confirm . . . that Mr. Elledge has consistently been competent and of above-average intelligence." Id. at 10-11. The trial judge also notes in his final report that Elledge "seems like a bright man." Dr. Muscatel did not specifically assess Elledge's intelligence level, nor did he make a finding as to whether Elledge is "mentally retarded." However, Dr. Muscatel did find Elledge to be legally competent and there is nothing in his report indicating that Elledge may be of subaverage intelligence. While none of the above comments and reports definitively establish that Elledge is not "mentally retarded," they are

more than this court has required in prior cases. *See Elmore*, 139 Wn.2d at 311 ("[M]ental disability was never an issue in this case and Elmore never claimed it was. In fact . . . Elmore's attorney assured the court Elmore was mentally competent."). Nevertheless, in future cases, we advise counsel that if a competency evaluation is conducted, an evaluation of whether the defendant is mentally retarded within the meaning of RCW 10.95.030 should also be made.

## CONCLUSION

We hold that Elledge's waiver of his right to appeal was made "knowingly, voluntarily, and intelligently." We further hold that: (1) there was sufficient evidence for the jury to determine that there were not sufficient mitigating factors to merit leniency; (2) Elledge's sentence of death is not disproportionate to the sentences imposed in similar cases; (3) the verdict was not brought about through passion or prejudice; and (4) Elledge is not mentally retarded. Accordingly, Elledge's sentence of death is affirmed.

ALEXANDER, C.J., SMITH, JOHNSON, IRELAND, and BRIDGE, JJ., and GUY, J. Pro Tem., concur.

SANDERS, J. (dissenting) — Proportionality review is vital to the capital process because arbitrary or discriminatory imposition of the death penalty is repugnant to the Eighth Amendment to the United States Constitution and article I, section 14, of the Washington Constitution. *In re Pers. Restraint of Rupe*, 115 Wn.2d 379, 393-94, 798 P.2d 780 (1990). These provisions set forth the minimally acceptable constitutional floor which our legislature may exceed by statute. This, I argue, is exactly what RCW 10.95.130(2)(b) accomplished. That statute requires us to consider:

> Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

RCW 10.95.130(2)(b).

Notwithstanding this plain language our statutorily required review has degenerated through numerous iterations[6] into the current "wanton and freakish" standard, finally becoming little more than lip service to the important protection proportionality review was originally intended to offer. I posit this subverts the statute contrary to the appropriate function of the judiciary.

Ordinarily we do not subject unambiguous statutes to the canons of judicial construction. *See Enter. Leasing, Inc. v. City of Tacoma*, 139 Wn.2d 546, 552, 988 P.2d 961 (1999) ("When words in a statute are plain and unambiguous, statutory construction is not necessary, and this court must apply the statute as written unless the statute evidences an intent to the contrary."). Therefore let us initially focus on the plain meaning of the words.

"Excessive" is defined as "exceeding the usual, proper, or normal." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 792 (1981). "Disproportionate" means "out of proportion," *id.* at 655, where "proportional" is defined as "corresponding in size, degree, or intensity," *id.* at 1819. Thus, the clear language of the statute requires us to consider whether the sentence of death exceeds the usual sentence imposed for similar conduct. If so, it is disproportionate.

However, rather than determine whether death was *generally* imposed in similar cases, the majority now begins with the premise the defendant is "qualified" for the death penalty so long as it is not "wantonly and freakishly" imposed, *notwithstanding how many others may have engaged in similar conduct who were not executed. State v. Elmore*, 139 Wn.2d 250, 308, 985 P.2d 289 (1999) ("If the facts of [the defendant's] case are similar to some of the facts taken from cases in which the death penalty was upheld, the proportionality review is satisfied."); *State v. Brett*, 126 Wn.2d 136, 210-11, 892 P.2d 29 (1995) ("[T]he legislative guidelines contained in RCW 10.95 within which

---

[6] *See, e.g., State v. Lord*, 117 Wn.2d 829, 911, 822 P.2d 177 (1991) (suggesting a "family resemblances" approach); *State v. Benn*, 120 Wn.2d 631, 680-93, 845 P.2d 289 (1993) (suggesting a statistically based approach).

the jury must exercise its discretion ensure proportionality and eliminate the ability of the jury, in all but the most aberrant case, to impose the death sentence in a wanton and freakish manner. Thus, our review, to be constitutionally sufficient, need only find that aberrant or 'disproportionate' case.").

As Justice Utter so eloquently stated:

> What that opinion characterizes as "an increasingly broad approach" to defining "similar cases" is more aptly described as the gradual degeneration of judicial review in capital cases, a process which reaches its low point with the introduction into our proportionality analysis of a new, and curiously elusive, concept: all murders falling within the purview of RCW 10.95 are, ipso facto, proportionate—except when they are not . . . .

*Id.* at 227 (Utter, J., dissenting).[7] Perpetuating this illusory "proportionality" standard, the majority now asks only whether the sentence was wanton, "marked by or manifesting heedless disregard of justice or of the rights . . . of others," Webster's Third New International Dictionary at 2575, and freakish, "being or befitting a freak: markedly odd or abnormal," *id.* at 904. I posit this new standard is, itself, "wanton and freakish" in its disregard for the plain language and intent of our mandatory proportionality review under RCW 10.95.130(2)(b). I challenge the majority to find any accepted definition of any term used in the proportionality statute which incorporates "wanton" or "freakish." Rather it is plain these terms were lifted from *Furman v. Georgia*, 408 U.S. 238, 92 S. Ct. 2726, 33 L. Ed. 2d 346 (1972), which described the minimum process due under the Fourteenth Amendment, not that process due under our statute. *See State v. Harris*, 106 Wn.2d 784, 797-98, 725 P.2d 975 (1986) (citing *Furman*, 408 U.S. at 310 (Stewart, J., concurring)).

Even if the mandatory language of RCW 10.95.130 were

---

[7] *See also Benn*, 120 Wn.2d at 697-98 (Utter, J., dissenting); *Lord*, 117 Wn.2d at 939 (Utter, J., dissenting); *In re Pers. Restraint of Jeffries*, 114 Wn.2d 485, 505, 789 P.2d 731 (1990) (Utter, J., concurring in part, dissenting in part).

ambiguous, which it is not, the rule of lenity would require this criminal statute to be strictly construed against the State, resolving all ambiguities in favor of the accused. *State v. McGee*, 122 Wn.2d 783, 787, 864 P.2d 912 (1993). The proposition that "our review, to be constitutionally sufficient, need only find [a single] aberrant or 'disproportionate' case" is a far cry from lenity, especially in this, the most critical of contexts. *Brett*, 126 Wn.2d at 211.

I also take exception to the majority's continuing erroneous consideration for proportionality review purposes cases in which the death penalty was ultimately *vacated*. Although this practice impermissibly skews the database review in favor of death, the majority dismisses the issue in a mere footnote, defending its position "so long as the penalty determination was not overturned on the basis of the penalty being disproportionately imposed." Majority at 79 n.5. This approach is utter nonsense since the proportionality statute instructs us to consider the penalty actually "imposed" in similar cases, not the penalty "proposed."

Prior death cases are cited in the majority's proportionality review *only* to justify the death sentence in the present case, and *only* because death was *proposed* in the prior case, without regard to whether a death sentence in the instant case is generally proportional, i.e., the same as, the penalty *imposed* in all other cases involving like conduct. *See, e.g., Elmore*, 139 Wn.2d at 308-11; *State v. Davis*, 141 Wn.2d 798, 882-84, 10 P.3d 977 (2000). When the death sentence is reversed, and is never imposed, the case must be considered as one where the death penalty *wasn't* imposed, not one where it was—*Brett*, for example. *See In re Pers. Restraint of Brett*, 142 Wn.2d 868, 16 P.3d 601 (2001); Stephanie Thomson, *Guilty Plea Brings Life Without Parole*, THE COLUMBIAN (Vancouver, Wash.), Mar. 23, 2001, at 1.

Nonetheless, the majority summarily rejects these arguments and would apparently allow cases in which death was never imposed at all to support imposition of death in later cases.

Beyond that, the proportionality database is itself flawed

because it (1) does not contain any cases in which first degree aggravated murder could have been charged but was not; (2) is not updated to reflect the subsequent reversal of the cases it contains; and (3) is missing a staggering number of cases *required* by RCW 10.95.130 in which defendants were convicted of aggravated first degree murder *but no death penalty was imposed*. Even if the court were to consider whether death was generally imposed in similar cases (which it no longer apparently does), the universe of cases we are supposed to consider is markedly skewed by these factors *against the defendant, in favor of imposing death*, and contrary to the statute.

Absent any demonstration in the instant case that the death sentence is imposed more often than not for similar conduct, I dissent.