IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, | No. 80804-4-I |
| Respondent, | |
| | DIVISION ONE |
| v. | |
| | UNPUBLISHED OPINION |
| BRANDON LEE CARPENTER, | |
| Appellant. | |

CHUN, J. —The State charged Brandon Carpenter with one count of possession of a stolen vehicle, one count of evading pursuing police, and three counts of second degree assault. The State amended the information to include another count of possession of a stolen vehicle for a different car. Carpenter objected to the joinder of this count and alternatively moved to sever it from the others, if the trial court decided that joinder was proper. The trial court determined that joinder was proper and denied the motion to sever. A jury found Carpenter guilty as charged. On appeal, Carpenter raises the joinder issue and, for the first time, claims prosecutorial misconduct. We affirm.

I. <u>BACKGROUND</u>

In early March 2018, someone stole David Knudson's 1995 green Honda Accord from his house in Everett. He reported the theft to law enforcement. Around 1:00 a.m. on March 25, on a highway in Sultan, Deputy Christopher Johnson changed lanes and began driving behind the green Accord. The driver

Citations and pin cites are based on the Westlaw online version of the cited material.

of the Accord made an immediate exit off the highway. Because of this behavior, Johnson followed the car, ran its license plate, and confirmed it was stolen. Johnson could not see who was inside the car. The driver took a series of right turns and Johnson lost sight of it.

Shortly after, Johnson found the car on a riverbank with its front bumper in some brush. He found a woman, Jeannene Ramos, walking away from the car. Ramos told the officer that the driver had fled towards the river, but Johnson could not locate anyone using a canine tracker. At trial, Ramos testified that "Brandon" was the driver of the green Accord and identified Carpenter. She said that she had been at a social gathering with Carpenter earlier that night and he had offered to drive her home. Johnson searched the car and found Carpenter's wallet and checkbook; the wallet contained Carpenter's identification and credit cards.

Also in the early morning of March 25, someone stole Tacia Beaumont's maroon 1992 Honda Civic from her house in Sultan, around half a mile from the abandoned green Accord. She reported the theft to law enforcement.

Around 14 hours later, at about 3:40 p.m., Officer Devin Tucker saw the Civic parked in the driveway of a house in Monroe. He ran the license plate and confirmed it was a stolen vehicle. A few minutes later, a man came out of the house, got into the Civic, and started the car. Tucker activated his sirens and flashing lights and pulled into the driveway to block the Civic. He was about four feet away from the driver's seat of the Civic. At trial, Tucker testified that he

2

"locked eyes" with the driver through the Civic's window and identified the driver as Carpenter. Tucker described Carpenter as a white man wearing a grey hat. Tucker yelled at Carpenter to stop but he accelerated around Tucker's car, cutting through the neighboring yard to escape. Tucker followed and alerted other units of the pursuit. With Tucker and other units in pursuit, Carpenter sped through town, exceeding the speed limit of 25 miles per hour (mph), driving on the shoulder of the road, and driving on the sidewalk. Carpenter then ran a red light at which time, in the interest of public safety, the officers terminated their pursuit.

Officers Hannah Snavely and Jake Carswell were in a police vehicle and coordinating with other officers to apprehend Carpenter. The maroon Civic approached them and then swerved into their lane, moving directly towards the front of their vehicle. Snavely tried to position her vehicle behind a light pole to create a buffer in case of collision. The Civic returned to its lane without hitting the patrol vehicle. Snavely did not get a good look at the driver and testified that he was a white male wearing a light-colored, flat-billed cap.

Sergeant Ryan Boyer was stopped at a stop sign in his police vehicle when the maroon Civic appeared in front of him. The Civic switched into Boyer's lane and drove directly at him at about 50 mph. The Civic swerved back into its own lane and did not hit Boyer's car. Boyer also did not get a good look at the driver and said that he was a white male in his twenties to early thirties, wearing a flat-billed white hat.

3

Several hours later, around 6:45 pm, Officer Trevor Larson was in his vehicle and stopped at a light when the maroon Civic approached him from behind. The Civic braked, its tires squealed, and it turned around and sped in the opposite direction. Rather than pursue the Civic, Larson drove to a different road, planning to deploy spike strips to stop the Civic. As the Civic approached, Larson realized he did not have enough time to deploy the strips and instead stood on the road's median to get a look at the driver. At trial, Larson identified the driver as Carpenter and testified that Carpenter was wearing a "gray baseball-style hat." Larson testified that the Civic was going 75 to 80 mph as it travelled past him.

Sergeant Spencer Robinson had positioned his marked vehicle across the southbound lane of an intersection just beyond where Larson was standing. The Civic, heading north, switched lanes and drove directly at Robinson's car at around 80 mph. Robinson accelerated quickly out of the intersection. The Civic came within a "car length" of the back of Robinson's car and continued driving. Robinson did not see the driver.

The State at first charged Carpenter for offenses involving only the maroon Civic: one count of possession of a stolen vehicle, one count of attempting to elude a pursuing police vehicle, and three counts of second degree assault. The State then amended the information and added another count of possession of a stolen vehicle for the green Accord. The State also separated the second degree assault count involving Snavely and Carswell into two counts.

4

Before trial, Carpenter objected to the joinder of Count 1 (involving the green Accord) with Counts 2–7 (involving the maroon Civic). Carpenter alternatively moved to sever Count 1 from Counts 2–7 if the trial court determined that joinder was proper. The trial court determined that joinder was proper and denied the motion to sever.

At the beginning of trial, Carpenter renewed his motion to sever and the trial court again denied the motion. The jury found Carpenter guilty as charged.

After trial, Carpenter moved for a new trial based partially on the denial of the motion to sever. The trial court denied the motion.

## II. ANALYSIS

### A. Joinder & Severance

Carpenter says that the trial court erred by joining Count 1 with Counts 2–7 over his objection and by denying his motion to sever the counts. We conclude the trial court acted within its discretion.

We review a joinder or severance decision for abuse of discretion. See State v. Bluford, 188 Wn.2d 298, 310, 393 P.3d 1219 (2017) ("We review a trial court's joinder decision for abuse of its 'considerable discretion.'" (quoting State v. Thompson, 88 Wn.2d 518, 525, 564 P.2d 315 (1977), overruled by State v. Thornton, 119 Wn.2d 578, 835 P.2d 216 (1992))); State v. Nguyen, 10 Wn. App. 2d 797, 814–15, 450 P.3d 630, review denied 195 Wn.2d 1012, 460 P.3d 178 (2020) ("We review a trial court's denial of a defendant's request to sever properly joined offenses for manifest abuse of discretion."). "A trial court abuses

5

it [sic] discretion when its decision is manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons." State v. Ramirez, 7 Wn. App. 2d 277, 286, 432 P.3d 454, review denied, 193 Wn.2d 1025, 445 P.3d 567 (2019).

Under CrR 4.3(a), a trial court may join multiple counts together in one charging document when the offenses are "of the same or similar character" or are "based on the same conduct or on a series of acts connected together" unless joinder would be prejudicial to the defendant.[1] See Bluford, 188 Wn.2d at 310. And under CrR 4.4(b), the trial court must sever counts when it determines that severance will promote a fair trial and avoid prejudice. See Nguyen, 10 Wn. App. 2d at 815. But "[t]he law does not favor separate trials." State v. Huynh, 175 Wn. App. 896, 908, 307 P.3d 788 (2013).

> To determine whether prejudice precludes joinder or requires severance,
>
> "a trial court must consider (1) the strength of the State's evidence on each count; (2) the clarity of defenses as to each count; (3) court instructions to the jury to consider each count separately; and (4) the admissibility of evidence of the other charges even if not joined for trial."

State v. Slater, No. 98795-5, slip op. at 18 (Wash. May 20, 2021) https://www.courts.wa.gov/opinions/pdf/987955.pdf (quoting State v. Russell 125 Wn.2d 24, 63, 882 P.2d 747 (1994)); Bluford, 188 Wn.2d at 311–12. This inquiry seeks to prevent a trial in which the defendant is forced to present separate or conflicting defenses or which "invites the jury to cumulate evidence to find guilt or infer a criminal disposition." Slater, slip op. at 17 (quoting Russell, 125 Wn.2d at

---

[1] The parties do not dispute whether the counts were of a similar character or connected. Thus, we address only prejudice.

62–63).  Defendants not only have to show that the four factors show prejudice, they must also establish that a joint trial would be so "'prejudicial as to outweigh concern for judicial economy.'"  Slater, slip op. at 17 (quoting State v. Bythrow, 114 Wn.2d 713, 718, 790 P.2d 154 (1990)).

Before trial, the court ruled that joinder was proper and denied Carpenter's motion to sever.  The trial court noted that "the evidence is cross-admissible because of the actions that occurred in a relatively short period of time" and that the jury could reasonably infer that the driver of the green Accord stole the maroon Civic.  The court also pointed out that the concept of judicial economy is not limited to whether witnesses would have to testify more than once, but that it also includes the time and resources for the whole court system.  The court said that Carpenter's defenses did not conflict.  It also said that the evidence for Count 1 and Counts 2–7 was "equally strong."  It noted that it could instruct the jury as necessary to prevent any potential prejudice.  Upon Carpenter's renewed motion to sever at the start of trial, the court reached the same conclusion, again noting that the evidence was cross-admissible.  And upon Carpenter's motion for a new trial, the trial court said that, after going through trial, it still thought severance was not required.

Because the joinder and severance issues require the same analysis, we consider them together.

7

1. Strength of State's evidence

Carpenter says that the evidence for Count 1 is stronger than the evidence for Counts 2–7 and thus this factor weighs against joinder and in favor of severance. He contends that the evidence for Counts 2–7 was "much shakier" because none of the officers who allegedly experienced an assault identified Carpenter and the two officers who did identify him were not credible. He notes that Officer Tucker omitted the fact that he "locked eyes" with Carpenter from the initial police report, and that Officer Larson would have had only seconds to perceive Carpenter as he sped by.

To the contrary, the evidence on each count carried relatively equal strength. For Count 1, Ramos said "Brandon" was the driver and Officer Johnson found Carpenter's wallet and checkbook in the green Accord. While Ramos noted that she was initially wrong about his last name, she identified Carpenter at trial. For Counts 2–7, Officers Tucker and Larson identified Carpenter as the driver of the maroon Civic; and Officer Snavely and Sergeant Boyer gave general descriptions of a white man in a light-colored hat that corresponded with Tucker and Larson's descriptions. While Tucker acknowledged at trial that he did not include in his initial report that he had been four feet from Carpenter and "locked eyes" with him, his supplemental report said that he was four feet away and had a "clear visual" of Carpenter. And while Larson had little time to perceive Carpenter as he sped past, his entire focus was on doing so. He said he got a good look at the driver from about ten feet away,

and he was "100 percent positive" Carpenter was the driver. Thus, eyewitness testimony identified Carpenter as the driver of both vehicles and other evidence corroborated those identifications.

2. Defenses for each count

Carpenter says that his two defenses—incomplete identity for Count 1 and mistaken identity for Counts 2–7—undercut each other.[2] His incomplete identity defense is that Officer Johnson did not see the driver of the Accord and that Ramos gave the wrong last name to officers. His mistaken identity defense is that someone else was driving the Civic. He says that the two undercut each other because a jury is less likely to believe that Ramos was lying about her identification *and* that the officers misidentified the driver of the Civic versus one of those on its own.

But Carpenter's defense for all the counts is that he was not the driver of either the Accord for Count 1 or the Civic for Counts 2–7; that he claims he was not the driver of one car does not undermine his claim that he was not the driver of the other. Thus, the trial court did not force him to present conflicting defenses. See Ramirez, 7 Wn. App. at 286 (concluding that "three asserted defenses of identity and general denial" were not antagonistic defenses).

3. Jury instructions

Carpenter says that the court gave the jury inadequate instructions and that this factor weighs heavily in favor of severance. The trial court instructed the jury, "A separate crime is charged in each count. You must decide each count

---

[2] But Carpenter acknowledges that this is not the strongest factor in his favor.

separately. Your verdict on one count should not control your verdict on any other count." The instruction mirrors the Washington Pattern Jury Instructions. 11 WASHINGTON PRACTICE, PATTERN JURY INSTRUCTIONS: CRIMINAL 3.01 (5th ed.).

Carpenter relies on State v. Sutherby, a sexual assault case, to say that the trial court should have also instructed the jury not to use evidence of one crime to determine guilt for a separate crime. 165 Wn.2d 870, 885–86, 204 P.3d 916 (2009). In Sutherby, our Supreme Court held that the trial court erred in failing to sever charges for possession of child pornography from charges of child rape and molestation, in part based on the jury instruction factor of the prejudice analysis. Id. The court noted:

> Third, though the jury was instructed to decide each count separately, the State consistently argued that the presence of child pornography on Sutherby's computers proved he sexually abused his granddaughter, stating it "shows his motive; why he touched L.K." The State further argued:

> "And how do you know that this man has a problem with sex with children and he fantasized about it and this was a present for him? You saw all, not all of it, but you saw a representative sample from the child pornography on that screen. We know he is predisposed to touching children in a sexual manner."

> Additionally, there was no limiting instruction directing the jury that the evidence of one crime could not be used to decide guilt for a separate crime.

Id.

Sutherby is distinguishable because of the "particularly prejudicial" nature of sexual crimes and the unlikelihood that evidence would be cross-admissible. See id. at 884. As discussed below, evidence on Count 1 was cross-admissible as to the other counts. And in reaching its conclusion, the Sutherby court

considered the lack of a limiting instruction along with the prosecution's repeated propensity arguments. Carpenter says that the State conflated evidence during closing argument. But unlike the facts of Sutherby, the prosecutor did not make a propensity or predisposition argument. Rather, the prosecutor told the jury to consider the "totality" of the evidence and to view it as a "whole."[3] And the prosecutor told the jury to consider relevant and admissible evidence to determine the elements of each charged crime.

The trial court here adequately instructed the jury by telling it to decide each count separately. See Nguyen, 10 Wn. App. 2d at 818 ("Since the jury was instructed to decide the charges separately and the prosecutor did not conflate evidence during closing argument, this prong weighs against severance"). And we presume the jury followed the instruction. See State v. Kirkman, 159 Wn.2d 918, 928, 155 P.3d 125 (2007) ("Juries are presumed to have followed the trial court's instructions, absent evidence proving the contrary.").

4. Cross-admissibility of evidence

Carpenter says that the evidence for Count 1 and Counts 2–7 was not cross-admissible and thus the court should not have tried them together. He focuses on whether the evidence from Count 1 was admissible for Counts 2–7, not vice versa. He claims that ER 404(b) bars the admission of evidence from Count 1 and that the only two potentially applicable exceptions—res gestae and identity—do not make the evidence admissible. We disagree.

---

[3] We discuss these statements in more detail in the prosecutorial misconduct section below.

Evidence from Count 1 is admissible under the knowledge exception to ER 404(b) as to Count 2.[4] ER 404(b) states that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of . . . knowledge [or] identity." Evidence that Carpenter abandoned the stolen green Accord and fled on foot about a half a mile away from where the maroon Civic was stolen suggests that Carpenter was the one to steal the Civic. If Carpenter stole the Civic, he knew it was stolen, which is an element of Count 2, the possession charge. Thus, the evidence from Count 1 satisfies the knowledge exception.

The res gestae doctrine also applies here. Res gestae evidence is evidence "'admissible to complete the story of a crime or to provide the immediate context for events close in both time and place to the charged crime.'" State v. Dillon, 12 Wn. App. 2d 133, 148, 456 P.3d 1199, review denied, 195 Wn.2d 1022, 464 P.3d 198 (2020) (quoting State v. Lillard, 122 Wn. App. 422, 432, 93 P.3d 969 (2004)).

The evidence from all seven counts is res gestae evidence admissible to "complete the story" of what happened on March 25. Carpenter emphasizes that 14 hours separated Count 1 from the remaining counts, but all the charged events occurred the same day. Cf. State v. Brown, 132 Wn.2d 529, 576, 940 P.2d 546 (1997) ("geographical distance [of hundreds of miles] and the passage

---

[4] Carpenter says that the identity exception does not apply. The State does not contend otherwise; nor did the trial court. Thus, we do not address this issue.

of two days between these two similar and connected crimes do not defeat immediacy of context in this case.").  That the alleged crime for Count 1 occurred in Sultan while the other alleged crimes occurred in Monroe similarly does not cut against res gestae admissibility; fewer than ten miles separate the towns.  Cf. id.

5.      Prejudice versus judicial economy

Carpenter says that the prejudice of joinder outweighed judicial economy. He claims that the joint trial was highly prejudicial based on the four factors and because the State used the evidence from Count 1 to bolster its case for the remaining counts.  And he says that because the trial was short and witnesses for Count 1 did not overlap with the witnesses for the other counts, judicial economy was not a large concern.  We conclude that the trial court acted within its discretion in joining the seven counts and denying Carpenter's motion to sever.

In Bythrow, a robbery case, the court determined that, despite a lack of cross-admissibility of some evidence, the trial court acted within its discretion denying a motion to sever.  114 Wn.2d at 720, 723.  In reaching its conclusion the court discussed these considerations:

> Bythrow's trial lasted 2 days.  The State presented evidence of the robberies in sequence with one exception.  Different witnesses testified concerning different offenses.  The issues and defenses were simple and distinct.  The court instructed the jury that "[a] separate crime is charged in each count.  You must decide each count separately.  Your verdict on one count should not control your verdict on any other count."

Id. at 723.  The court determined that given the "relatively simple" nature of the issues, the "jury can be reasonably expected to compartmentalize the evidence,"

13

even if it would not have been cross-admissible in separate trials. Id. at 721. The court in assessing judicial economy noted, "A single trial obviously only requires one courtroom and judge. Only one group of jurors need serve, and the expenditure of time for jury voir dire and trial is significantly reduced when the offenses are tried together." Id. at 723.

This case resembles Bythrow.[5] Carpenter's trial was also two days long and the evidence was presented sequentially. The issues were relatively straightforward and each count was distinct. As noted above, the trial court instructed the jury similarly about separate counts. But unlike in Bythrow, the evidence from Count 1 is cross-admissible as res gestae and knowledge evidence, which also supports joinder. Though Carpenter claims the interest in judicial economy is low given separate witnesses for Count 1 and the other counts, as the trial court and the Bythrow court noted, judicial economy encompasses more considerations.

On balance, considering all four factors and weighing them against judicial economy, the trial court acted within its discretion in determining a lack of impermissible prejudice in trying the counts together. See State v. Kalakosky, 121 Wn.2d 525, 539, 852 P.2d 1064 (1993) (upholding a denial of severance where "the crimes were not particularly difficult to 'compartmentalize', [where] the

---

[5] Carpenter relies instead on Bluford to argue that prejudice does outweigh judicial economy. 188 Wn.2d at 315–16 (determining that "because the evidence was not cross admissible, the interest in judicial economy loses much of its force"). But Bluford is less comparable than Bythrow here because the evidence was not cross-admissible and it involved multiple sexual offenses. Id. at 315 (noting the "'inherently prejudicial effect of prior sexual offenses.'" (quoting Bythrow, 114 Wn.2d at 718–19)).

State's evidence on each count was strong, and [where] the trial court instructed the jury to consider the crimes separately").

B. Prosecutorial Misconduct

For the first time on appeal, Carpenter says that the State committed prosecutorial misconduct during closing argument in a number of ways. We disagree with his arguments.

"The trial judge is generally in the best position to determine whether the prosecutor's actions were improper and whether, under the circumstances, they were prejudicial." State v. Ish, 170 Wn.2d 189, 195–96, 241 P.3d 389 (2010).

A prosecutor must ensure that they do not violate a defendant's rights to a constitutionally fair trial. State v. Monday, 171 Wn.2d 667, 676, 257 P.3d 551 (2011). To establish misconduct, the defendant bears the burden of first showing that the prosecutor's comments were improper. State v. Boyd, 1 Wn. App. 2d 501, 517–18, 408 P.3d 362 (2017); State v. Emery, 174 Wn.2d 741, 759, 278 P.3d 653 (2012). Even if the comments were improper, "[i]f the defendant did not object at trial, the defendant is deemed to have waived any error, unless the prosecutor's misconduct was so flagrant and ill intentioned [sic] that an instruction could not have cured the resulting prejudice." Emery, 174 Wn.2d at 760–61. If defense counsel fails to object to allegedly improper comments made by a prosecutor, it "'strongly suggests'" that the comments "'did not appear critically prejudicial to [the defendant] in the context of the trial.'" State v. McKenzie, 157 Wn.2d 44, 53 n.2, 134 P.3d 221 (2006) (emphasis omitted)

15

(quoting State v. Swan, 114 Wn.2d 613, 661, 790 P.2d 610 (1990)).  We do not examine improper conduct in isolation but determine its effect by looking at "the full trial context, including the evidence presented, 'the context of the total argument, the issues in the case, the evidence addressed in the argument, and the instructions given to the jury.'"  Monday, 171 Wn.2d at 675 (internal quotation marks omitted) (quoting McKenzie, 157 Wn.2d at 52).

    1.  Passions and prejudices of the jury

It is misconduct to inflame the passions and prejudices of the jury or to rely on evidence outside the record.  State v. Fisher, 165 Wn.2d 727, 747, 202 P.3d 937 (2009).  Such arguments include those "intended to 'incite feelings of fear, anger, and a desire for revenge' and arguments that are 'irrelevant, irrational, and inflammatory . . . that prevent calm and dispassionate appraisal of the evidence.'"  State v. Elledge, 144 Wn.2d 62, 85, 26 P.3d 271 (2001), (alteration in original) (quoting BENNET L. GERSHMAN, TRIAL ERROR AND MISCONDUCT § 2–6(b)(2) at 171–72 (1997)).

Carpenter contends that two comments by the prosecutor during closing argument improperly inflamed the passions and prejudices of the jury.  First, the prosecutor said, "[Carpenter] did not care if he endangered Ms. Ramos, he didn't care if he endangered others [sic] drivers, he wasn't concerned about that.  He was concerned about one thing, and that was saving himself and getting away from the police."  Second, the prosecutor said,

> Exhibiting the same frame of mind that he had earlier up in Sultan, he was prepared to endanger all of Monroe.  Any driver out that day in that area, any citizen out that happened to be out on their lawn or

16

sidewalk, that was not any of the defendant's concern. He was concerned about one thing, and that was getting away from Tucker.

Carpenter did not object.

Carpenter says these comments made the jury focus on the dangerousness of his actions which was not relevant to the charges. But as the State notes, viewed contextually, these comments were not improper. The willingness to drive dangerously was circumstantial evidence that Carpenter knew that the cars he was driving were stolen, an element of the crime of possession of a stolen vehicle. See In Re the Pers. Restraint of Yates, 177 Wn.2d 1, 58, 296 P.3d 872 (2013) ("the prosecuting attorney has 'wide latitude in making arguments to the jury and prosecutors are allowed to draw reasonable inferences from the evidence.'" (quoting Fisher, 165 Wn.2d at 747)). Nor does Carpenter establish that the comments were so flagrant and ill-intentioned that a curative instruction could not address any resultant prejudice. See Emery, 174 Wn.2d at 760–61.

Carpenter also says that the prosecutor improperly relied on inflammatory hypotheticals in its closing argument. The prosecutor said, "I hope I don't have to emphasize here how there could have been a child out, perhaps, playing behind a bush, something you wouldn't see. This—this had disaster written all over it." He also said, "Again, you know, this easily could have resulted in some sort of collision, somebody could have been hurt or killed here." And finally, he said "if [Carpenter] crashes into somebody at that point, very easily could have been a vehicular homicide charge." Carpenter did not object.

17

Emphasizing the dangerous nature of Carpenter's driving is relevant to establishing that he knew he was driving a stolen vehicle. And the comments are pertinent to establishing reckless driving—an element of the eluding charge. But emphasizing the harm that could have befallen someone, such as a child, as a result of Carpenter's driving seems calculated to inflame the passions and prejudices of the jury. Even so, Carpenter does not demonstrate that the comments were so flagrant and ill-intentioned that a curative instruction could not have addressed any prejudice. See Emery, 174 Wn.2d at 760–61. And again, if defense counsel fails to object to allegedly improper comments made by a prosecutor, it "'strongly suggests'" that the comments "'did not appear critically prejudicial to [the defendant] in the context of the trial.'" McKenzie, 157 Wn.2d at 53 n.2 (emphasis omitted) (quoting Swan, 114 Wn.2d at 661).

2. Propensity

Citing Fisher, Carpenter says that the prosecutor improperly encouraged jurors to convict him based on an argument that he had a propensity to commit the charged crimes. 165 Wn.2d at 748–49 (determining that relying on propensity evidence, after a pretrial ruling directing the prosecutor not to do so, was misconduct). The State responds that (1) it did not so encourage the jurors, (2) its comments were a fair response to defense counsel's arguments, and (3) Carpenter did not object.

During the defense's closing argument, counsel questioned the credibility of the identifications of Carpenter. Defense counsel noted that Ramos was an

unreliable witness because she had initially given the wrong last name and had a motive to lie to the police about the driver of the green Accord because she did not want to get in trouble herself.  And he added up the moments of contact between police and the maroon Civic and emphasized that two identifications from 12 separate contacts was a low percentage.

Carpenter challenges three comments the prosecutor made during rebuttal.  First, the prosecutor said,

> Well, the number one thing I want to emphasize in regard to this argument about identity is the facts in this case are in totality. [Defense counsel] might like to try to divide up the evidence and look at it individually, but it has to be looked at in totality from 1 a.m. when he was in Mr. Knudson's Accord through the rest of the afternoon because it all connects together.

Second, the prosecutor said of Ramos,

> There was no indication she had anything against the defendant.  He was giving her a ride home.  They may not be good friends, but they certainly were on good terms.  There's no reason to disbelieve her identity of him.  And certainly not in light of his leaving his driver's license behind.  And from that point forward, it just keeps leading on to the events in Monroe.  So they have to be looked at really as a whole.

And third, the prosecutor said, "So the defendant has been identified beyond a reasonable doubt, particularly in light of all of the facts of this case which have to be looked at in totality."  Carpenter did not object to any of these comments.

Because we conclude above that the evidence as to Count 1 was cross-admissible, the State did not commit misconduct by referencing the "totality" of evidence.  And the State's argument regarding identity did not amount to an assertion that evidence on Count 1 showed his predisposition as to Counts 2–7.  Yet even assuming the comments were improper, Carpenter does not establish

19

that the State's comments were so flagrant and ill-intentioned that a curative instruction could not have addressed any prejudice. See Emery, 174 Wn.2d at 760–61.

Carpenter also says that the State committed misconduct by referencing uncharged crimes in its closing argument. The State responds that Carpenter did not object and that its comments were proper references to circumstantial evidence of elements of the charged crimes.

> The prosecution commented,

> Whether or not he stole [the green Accord], we can safely conclude he stole [the maroon Civic]. It's not hard to see how that happened. He was without a ride, found himself in the middle of the night in Sultan, had no transportation, all he had to do is get back across the bridge after Johnson leaves, go into town, this is one half mile to [the maroon Civic] which he then simply stole.

> It's not—it's not a weird coincidence that these two vehicles are so similar. Both early '90s Hondas, they look very similar to one another. Whatever he was using to operate the Accord, probably some sort of shaved key or jiggle key, worked as well on the . . . Honda Civic.

Carpenter says that the prosecutor mentioned that Carpenter stole the maroon Civic and that he probably possessed a shaved key or jiggle key—both uncharged crimes—only to prove propensity. But as the State notes, stealing the car and using shaved keys to do so are relevant to the element of knowledge for the charge of possessing the maroon Civic. And stealing the car and possessing shaved keys are both reasonable inferences from the evidence. See State v. Allen, No. 73203-0-I, slip op. at 6–7 (Wash. Ct. App. Apr. 25, 2016) (Unpublished) http://www.courts.wa.gov/opinions/pdf/732030.pdf (determining no misconduct existed where the prosecutor mentioned an uncharged burglary

20

where testimony about the burglary was in evidence and the prosecutor made a permissible inference from that testimony); see GR 14.1 ("Washington appellate courts should not, unless necessary for a reasoned decision, cite or discuss unpublished opinions in their opinions."). Two people testified that Carpenter had keys to both cars, but there was no indication that the owners were missing keys. And the Civic was stolen close in time and place to where Carpenter abandoned the Accord. Nor does Carpenter demonstrate that the prosecutor's comments were so flagrant and ill-intentioned that a curative instruction could not address any prejudice. See Emery, 174 Wn.2d at 760–61.

We affirm.

Chun, J.

WE CONCUR:

Andrus, A.C.J.

Verellen, J.